Teresa L. HANSEN, Plaintiff,

v.

**CALIFORNIA DEPARTMENT OF CORRECTIONS, et al., Defendants.**

No. C–95–2251 WDB.

United States District Court, N.D. California.

March 25, 1996.

Gregory L. Hartwell and Sharon M. Shiller Hartwell, of Hartwell & Hartwell, Sacramento, CA, for plaintiff Teresa L. Hansen.

Geoffrey A. Beaty and Beverly M. Ma, of Fisher & Hurst, San Francisco, CA, for defendants California Department of Corrections, James Gomez, Daniel B. Vasquez, Edward V. Russell, and Robert I. Kim.

## OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

BRAZIL, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiff Teresa Hansen was subjected by her employer, the California Department of Corrections (CDC), to drug testing involving direct visual observation of urination. Hansen is suing the CDC, its director at the pertinent time, the warden of the facility in which she worked, and the officers who administered the drug testing, alleging violations of the Fourth Amendment, the federal constitutional right to bodily privacy, and the California Constitution's right to privacy. Defendants claim immunity under both federal and California law. Both sides have filed cross-motions for summary judgment.

While we believe that the U.S. Constitution probably prohibits direct observation of urination during drug testing absent reasonable, individualized, and articulable suspicion of an intent to tamper with the urine sample, we grant summary judgment to defendants regarding Hansen's federal claims on qualified immunity grounds, for the law governing Hansen's federal claims was not "clearly established" at the time defendants' conduct took place.

We reject the immunity claims of two of the defendants (the officers who administered the drug testing) under California law, because these two defendants were not exercising discretion but simply following a policy set by others when they required the drug testing to be directly observed. We are unable to determine from the record before us whether two other defendants (the director

of the CDC and the warden at the facility where Hansen worked) are protected by immunity under California law.

When we reach the merits, we find that defendants' drug testing procedures violated the California Constitution's right to privacy. We therefore grant summary judgment on the issue of liability (as opposed to the amount of damages) on Hansen's California law privacy claim against the two defendants found not to be immune.

## II. FACTS

Hansen is a female CDC correctional officer stationed at a correctional facility called CTF–Soledad (Soledad). *See* Defendant's Statement in Opposition to Plaintiff's Statement of Undisputed Material Facts (DSO) ¶ 1. In addition to CDC, Hansen is suing four CDC officers in their official and individual capacities: James Gomez, CDC's director at the time the drug testing giving rise to this action took place; Daniel Vasquez, Soledad's warden during some of the time that the drug testing took place; Edward Russell, an investigative captain at Soledad at the time of the drug testing; and Robert Kim, a sergeant at Soledad at the time of the drug testing. DSO ¶ 3.

Hansen has been employed by CDC for more than eight years. DSO ¶ 1. Hansen has regular contact with inmates; one of her responsibilities is supervising a work crew of about ten inmates. Hansen Dep. at 229.

In October 1993, Hansen revealed to Russell, the investigative captain, that she had used marijuana (in an off-duty setting) on one occasion during the time she was employed at CDC and that she had used cocaine on several occasions many years earlier, before the beginning of her employment at CDC. DSO ¶¶ 6–8. CDC took an "Adverse Action" against Hansen, which, among other disciplinary measures, required Hansen to submit to random drug testing for a one-year period. DSO ¶ 10. Hansen signed an agreement to voluntarily submit to random drug testing from January 18, 1994, through January 18, 1995. DSO ¶ 11. This agreement provided that the drug testing would be conducted in accordance with guidelines set forth in the collective bargaining agreement between CDC and the correctional employees' union. DSO ¶ 11.

The collective bargaining agreement in question, referred to by the parties as the Memorandum of Understanding (MOU), contains the following provision:

During the term of this agreement, the State agrees to *study the need to retain direct observation* of the employee providing the urine sample, and will meet and confer with CCPOA [the employees' union] upon completion of the study, or upon CCPOA request. The State and CCPOA may also mutually agree to modify this section in response to new technology or other improved procedures.

*See* Plaintiff's Response to Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (PRD) ¶ 39 (emphasis added). The MOU does not contain any other provision that alludes to direct observation of drug testing. *See* Defendants' Response to Plaintiff's Statement of Additional Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment (DRP) ¶ 4.

In the negotiations of the MOU, the employees' union objected to direct visual observation of urination during drug testing, threatened to sue CDC if direct observation continued, and never explicitly agreed to direct observation. DRP ¶¶ 1–3. Defendants have presented evidence that would support an inference that the union negotiators understood, at the time the MOU was signed, that the CDC intended to continue using direct observation of urination during drug testing of prison employees, even though there was no provision in the MOU expressly authorizing such direct observation. DRP ¶ 4.

The drug testing was administered by defendant Kim, the sergeant. Before the first drug test, Kim and Russell discussed the drug testing procedure and Russell told Kim that direct observation of urination was required by policy. Kim Dep. at 14–16, 19; Russell Dep. at 14, 19. The first drug test occurred on February 9, 1994. Prior to the administration of the test, Kim informed Hansen that the testing procedure would in-

volve direct observation of Hansen's urination by a female medical technician. Hansen objected to the direct observation, and stated to Kim that a union representative had told her that she would not be subject to direct frontal observation of urination. Kim Dep. at 29. Kim ordered Hansen to undergo the testing under direct observation, and Hansen's urination was directly observed by a female monitor. DSO ¶¶ 13–17.

After the first drug test, Hansen discussed her objection to the direct observation, as well as other concerns about the drug testing procedure, with a union representative. The union representative discussed Hansen's objections with Vasquez, the warden. Rafferty Decl. at 2. Vasquez communicated with a superior, CDC's acting regional administrator, who told him that CDC policy requires direct frontal observation. Vasquez Dep. at 19–20, 45. The record before us does not disclose what, if anything, Vasquez did with this information. We have not seen evidence, for example, that Vasquez then communicated to Russell and/or Kim that they were to make sure that direct observation remained a part of the testing of plaintiff.

After the first drug test, Kim and Russell discussed (with one another) Hansen's objections to direct observation, but did not consider making an attempt to have the direct observation policy changed. Russell Dep. at 39–40. Hansen underwent additional drug tests on April 5, May 26, July 12, and August 19, 1994. DSO ¶ 22. In each of these drug tests, Hansen's urination was directly observed by a female monitor. DSO ¶ 23.

Vasquez, Russell, and Kim each testified in depositions that CDC policy requires direct observation of urination during drug testing of employees. PRD ¶¶ 25, 36. Each of these three defendants also testified that their implementation of the drug testing procedures used on Hansen was in accordance with that policy. PRD ¶ 36. Each of the three also testified that they believed that a written policy exists which requires direct observation. Kim Dep. at 34–38; Russell Dep. at 18; Vasquez Dep. at 17.

No written policy about direct observation has been presented to this court; we do not know whether defendants have turned over such a policy to plaintiff. There is evidence in the record suggesting that, at the time of the events at issue, there was a statewide California Department of Personnel Administration (DPA) policy requiring direct observation of urination during employee drug testing. *See* Russell Dep. at 18.

Vasquez testified that the direct observation policy was probably communicated to him some time before Hansen's drug testing began. Vasquez Dep. at 17. Vasquez testified that the drug testing of Hansen was conducted under his authority. Vasquez Dep. at 36. Plaintiff and defendants agree that Vasquez and CDC director Gomez are responsible for implementing the policies of the CDC. DRP ¶ 5. However, there is no evidence in the record that Vasquez ever directly instructed Russell or Kim that CDC policy requires direct observation of employee urine testing or that direct observation should be used when testing Hansen. In addition, Gomez's deposition has not been taken, and there is no evidence in the record as to whether Gomez played a role in the formulation of the direct observation policy or whether Gomez only implemented a policy set by the DPA.

### III. PROCEEDINGS

In October of 1994 Hansen filed a complaint for damages and injunctive relief against CDC, Gomez, Vasquez, Russell, Kim, and another defendant who has since been dismissed from the suit. The complaint names Gomez, Vasquez, Russell, and Kim in both their official and their individual capacities. The complaint contains seven claims: (1) a damages claim under 42 U.S.C. § 1983 (1988) based on an unlawful search; (2) a damages claim under 42 U.S.C. § 1983 based on a violation of the federal constitutional right to bodily privacy; (3) a damages claim under 42 U.S.C. § 1983 based on failure to train or supervise; (4) a damages claim under California law based on a violation of the California Constitution's right to privacy; (5) a California common-law intentional infliction of emotional distress claim; (6) a California common-law negligent infliction of emotional distress claim; and (7) a request for temporary and permanent injunctive relief.

In October 1994, District Judge Robert P. Aguilar issued a temporary restraining order prohibiting direct visual observation of Hansen's urination during drug testing. *Hansen v. California Department of Correction*, 868 F.Supp. 271, 274 (N.D.Cal.1994). In December 1994, the parties stipulated to a preliminary injunction prohibiting visual observation of Hansen's urination. In July 1995, the case was reassigned to District Judge Eugene F. Lynch. With the parties' consent, the case was reassigned to this court in August of 1995.

In November of 1995 defendants filed a motion for summary judgment, and plaintiff filed a cross-motion for partial summary judgment. Defendants argue that summary judgment should be granted to them on Hansen's federal claims on the grounds of qualified immunity, or, alternatively, because the federal claims are substantively without merit. Defendants also argue that California statutory immunity law bars Hansen's California law claims. Defendants further contend that the Eleventh Amendment bars Hansen's claims against the individual defendants in their official capacities, as well as Hansen's California law claims against CDC. In addition, defendants contend that the Eleventh Amendment and California statutory law bar a punitive damages claim by Hansen against CDC. Finally, defendants argue that Hansen's claim for injunctive relief is moot.

Hansen moves for summary judgment on the issue of liability on each of her three federal claims. She also moves for summary judgment on the issue of liability on her California law privacy claim.

## IV. FEDERAL LAW CLAIMS

### A. *Qualified Immunity Law—Generally*

#### 1. *Is the Defense of Qualified Immunity Potentially Available to All Four of the Individual Defendants?*

■ Under the doctrine of qualified immunity "government officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). According to *Foster v. McGrail*, 844 F.Supp. 16, 23 (D.Mass.1994), "[p]recedents ... support a ... meaning for 'discretionary function' that includes not only a high level decision formulating a directive but also lower level administration of the directive, at least when some discretion must be exercised in the administration and enforcement."

In this case, however, the record indicates that defendants Vasquez, Russell, and Kim did not exercise any discretion in requiring direct observation of Hansen's urine test, but were merely following a policy set at a higher level. The record is silent about whether defendant Gomez exercised any discretion in requiring direct observation during all CDC employee drug testing or whether he only implemented a policy handed down to him by the DPA.

■ We believe that the correct rule of law in such a situation is that a public official should be immune from liability for nondiscretionary acts performed in good faith pursuant to a policy instituted by higher authorities unless a reasonable official would have known that the policy was unconstitutional. Two published opinions support this proposition.

In *Gonzalez v. Tilmer*, 775 F.Supp. 256, 258 (N.D.Ill.1991), a police officer detained a suspect for forty-eight hours without a determination of probable cause. A general order of the city police department permitted such long detention under the circumstances at issue. *Id.* at 265. Though the police department's policy was later declared unconstitutional, the court granted immunity to the police officer. *Id.* at 265–66. The court explained that "[a]n officer who is following a statute or administrative rule should generally be accorded qualified immunity for his actions unless a reasonable officer should have known that the law or rule in question was unconstitutional." *Id.* at 266 (citing *Richardson v. Bonds*, 860 F.2d 1427, 1432 (7th Cir.1988)).

In *Pray v. City of Sandusky*, 49 F.3d 1154 (6th Cir.1995), a city police department policy

required police officers executing a warrant to secure the premises being searched by placing all occupants on the floor. While the majority opinion did not address the impact of the policy in deciding the immunity issues raised in that case, a concurring judge stated that "[t]he officers are entitled to immunity for all their non-discretionary acts performed in good faith pursuant to the policy." *Id.* at 1161 (Batchelder, J., concurring) (citing *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985)).

These opinions are supported by the common-sense notion that, absent some assured statutory protection from another source, it would be unfair to subject an official to liability for following orders or policies which he has no authority, under the terms of his employment, to alter or ignore—unless, of course, a reasonable official should have known that the orders or policies offended established law. Moreover, exposing officials to liability in such situations could give them incentives not to follow directives given by superiors. This would be bad public policy because it could hamper the smooth and effective operation of government. *Cf. Scheuer v. Rhodes,* 416 U.S. 232, 241–42, 94 S.Ct. 1683, 1689, 40 L.Ed.2d 90 (1974) ("[p]ublic officials ... who fail to make decisions when they are needed *or who do not act to implement decisions* when they are made do not fully and faithfully perform the duties of their offices") (emphasis added).

For these reasons, we hold that all four individual defendants are immune if a reasonable official would not have known that applying the direct observation policy in the circumstances of this case would violate clearly established law.

### 2. *What Does the Phrase "Clearly Established" Mean in This Setting?*

■ *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), provides detailed guidance for ascertaining whether law is "clearly established" for purposes of qualified immunity. In *Anderson,* the Court explained that "the operation of [the 'clearly established'] standard ... depends substantially upon the level of generality at which the relevant 'legal rule' is to be

identified." *Id.* at 639, 107 S.Ct. at 3038–39. If the "clearly established" standard were to permit rights which officials are accused of violating to be described in overly general terms, officials would not receive immunity in some situations where a reasonable official would not have known that the plaintiff's rights were violated. *Id.* For this reason, the Court set forth the following test for determining whether a right is clearly established for qualified immunity purposes:

> *The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.* This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039 (citations omitted) (emphasis added).

■ On a number of occasions the Court of Appeals for the Ninth Circuit has elaborated on how to correctly apply the rule set out in *Anderson.* "A right can be clearly established even though there is no binding precedent in this circuit." *Lum v. Jensen,* 876 F.2d 1385, 1387 (9th Cir.1989), *cert. denied,* 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990). " '[T]he law simply does not require that we find a prior case with the exact factual situation in order to hold that the official breached a clearly established duty.' " *Neely v. Feinstein,* 50 F.3d 1502, 1507 (9th Cir.1995) (quoting *Alexander v. Perrill,* 916 F.2d 1392, 1397 (9th Cir.1990)). "Thus, when 'the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Mendoza v. Block,* 27 F.3d 1357, 1361 (9th Cir.1994) (quoting *Casteel v. Pieschek,* 3 F.3d 1050, 1053 (7th Cir.1993)).

"Absent binding precedent, we look to all available decisional law, including the law of other circuits and district courts, to determine whether the right was clearly established." *Lum,* 876 F.2d at 1387. "We also

evaluate the likelihood that this circuit or the Supreme Court would have reached the same result as courts that had already considered the issue." *Id.*

■ "Government officials are charged with knowledge of constitutional developments, including all available decisional law." *Tribble v. Gardner,* 860 F.2d 321, 324 (9th Cir.1988), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989). However, the Ninth Circuit does not "require of most government officials the kind of legal scholarship normally associated with law professors and academicians." *Ward v. County of San Diego,* 791 F.2d 1329, 1332 (9th Cir. 1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).

With these principles in mind, we turn to an examination of whether qualified immunity bars Hansen's claim that she is entitled to damages on the grounds that the direct observation of her urination was an unreasonable search under the Fourth Amendment.

### B. *The Fourth Amendment Claim*

#### 1. *The Doctrinal Setting—Generally.*

■ The law generally governing the application of the Fourth Amendment to urine drug testing is set forth in two Supreme Court cases which were published on the same day, *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

In *Skinner,* a union challenged federal regulations providing for drug testing of railroad employees if they are involved in an accident, if they commit certain safety violations, or if there is reasonable suspicion of on-duty alcohol or drug use. 489 U.S. at 609–11, 109 S.Ct. at 1408–10. The Court first held that urine drug testing is a search under the Fourth Amendment. *Id.* at 617, 109 S.Ct. at 1413. The Court then stated that the Fourth Amendment prohibits only unreasonable searches, *id.* at 619, 109 S.Ct. at 1414, and went on to balance the Fourth Amendment privacy interests of employees against the government interests supporting drug testing. *See id.* at 619–33, 109 S.Ct. at 1414–21.

The Court stated that employees who work in a highly regulated industry such as railroads have a diminished expectation of privacy, *id.* at 627, 109 S.Ct. at 1418, and upheld the challenged regulations. *Id.* at 633, 109 S.Ct. at 1421.

In *Von Raab,* the Court stated that "where a Fourth Amendment intrusion serves special government needs, beyond the normal need for law enforcement," such as public safety, "it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion." 489 U.S. at 665–66, 109 S.Ct. at 1390–91. The court "balanced the public interest" in the drug testing program challenged in the case "against the privacy concerns implicated by the [drug] tests." *See id.* at 679, 109 S.Ct. at 1398.

Under the guidance of these important Supreme Court precedents, lower federal courts have elaborated the controlling balancing analysis, refining our thinking about the magnitude of the various privacy interests that can be invaded by different approaches to testing, about factors affecting the reasonableness of expectations of privacy in different settings, about the relative importance of various governmental interests that testing can serve, and about how much those interests are likely to be advanced by particular testing regimens. As the cases have addressed new situations, it has become more apparent that the balancing test often is a subtle undertaking, requiring exercises of judgment and discrimination that are not always self-evident or self-executing—and therefore not always predictable with confidence.

This fact about the doctrinal landscape in early 1994 is of some significance in our analysis of the parties' competing contentions about the availability of qualified immunity to the defendants. It is more difficult, generally, to predict the outcomes of cases that turn on balancing analyses than the outcomes of cases that turn on some other kinds of tests, such as the compelling state interest test or the rational basis test. *Cf. Stanziale v. County of Monmouth,* 884 F.Supp. 140, 145

(D.N.J.1995) (observing that "[a]lthough it has been clearly established that courts must use a balancing test to determine the constitutional validity of a drug testing program, it certainly is not clear just how that delicate balancing is to be performed").

This is true, in part, because it often is difficult to know, in advance, how much weight (value) given judges will ascribe to competing interests, as well as what their views will be about how much a given governmental measure contributes toward the achievement of its purported ends. To some extent, these kinds of judgments are subjective and turn on the political values or perspectives of the judges. And it is not often that the courts are provided scientifically reliable studies that assess how well challenged governmental measures actually work (how much of the desired effect they deliver).

None of this is to say, of course, that governmental defendants will always enjoy qualified immunity whenever (1) the courts use a balancing test to resolve the issue in question and (2) at the time the challenged conduct occurred, the courts had not addressed, squarely, the lawfulness of that particular course of governmental action. In some settings, the outcome even of balancing tests will be fully foreseeable from the precedents. But in other settings, as here, the courts' use of this kind of analysis will reduce predictive certainty.

We also must bear in mind, from the outset, that not all judicial opinions lend themselves to only one rational interpretation or reading. As we shall see, below, some of the cases that are most important to our disposition of the qualified immunity defense in this action send some ambiguous messages—leaving room for reasonable minds to disagree about their implications for situations not squarely addressed. In settings like these, we are constrained to try to identify the zones or ranges of reasonable interpretations of the cases—and to reject a defendant's view of what the state of the law was (and what questions the law, fairly read, left open) only if that view is based on an interpretation of the authorities that falls fairly clearly outside that zone or range. Stated differently, if there are reasonable, not insubstantial bas-

es in the authorities for disagreement about what the law was or would be in the situation in the case at bar, we should not hold that the law was "clearly established." If, rationally, what the state of the law was is a close question, the law cannot be deemed "clearly established" for purposes of qualified immunity.

Another complicating factor about the area of doctrine we explore in detail below is the dynamic variability, in different settings, of the weights of the competing factors in the balancing analysis. While the courts uniformly recognize that, in the abstract, the privacy interest invaded by direct observation of urination is of great magnitude, they also acknowledge that how much privacy employees can legitimately expect can vary considerably from job to job or situation to situation. Thus, under the authorities, the same governmental act can result in a deep invasion of privacy for a person with one set of legitimate expectations but a much lesser invasion for a person whose situation reasonably gives rise to appreciably lower expectations of privacy. As a result, the extent of the harm to the privacy interest (i.e., the weight of the interests on the plaintiff's side of the scales) can vary dramatically with the relative sensitivity of the job that the plaintiff holds.

Similarly, the weight of the interests on the government's side of the scales is not static, but can vary considerably. It can be dramatically affected, for example, by the same relative sensitivity of the plaintiff's job. It also can grow or shrink with the presence or absence of reasonable suspicion—and with the relative firmness of the basis for such suspicion. Moreover, there can be at least three separate targets of reasonable suspicion: (1) drug use on the job, (2) drug use off the job, and (3) that the employee will tamper with the urine sample or otherwise try to compromise the reliability of the drug testing. Thus the predictability of doctrinal development is further clouded by the fact that the pertinent balancing analysis could be affected by so many variables, as well as the fact that the weights of some of the variables are interdependent (in some settings, an increase in the weight of one variable necessar-

ily results in a reduction in the weight of a competing variable).

In the sections that follow, we review first the case law that favors plaintiff's position on the immunity issue, then the case law that favors the position taken by the defendants. The spirit or tone of the cases on which plaintiff relies most heavily, especially Judge Mikva's opinion in *National Treasury Employees Union v. Yeutter*, 918 F.2d 968 (D.C.Cir.1990), is clearly inhospitable, generally, to direct observation of urination during drug testing. But neither that case nor any other confronts squarely the situation in the case at bar: where the government could try to justify the direct observation on the basis of *both* reasonable suspicion of drug use by a specific employee and the fact that she worked in a clearly sensitive position. Thus, at the time of the drug tests that plaintiff challenges here, there were no literally controlling authorities. Moreover, as we shall see, there was language in even the most favorable opinions that arguably left the door open to approval of direct observation in situations like the one at bar. When, against this backdrop, we add to the doctrinal mix the cases that appear to favor the defendants' position, we simply cannot conclude that the right that plaintiff contends was violated by the direct observation was "clearly established."

### 2. *Case Law Favoring the Plaintiff's Position.*

The case on which plaintiff relies most in support of her argument that defendants violated clearly established Fourth Amendment rights is *Yeutter*, 918 F.2d 968. In that opinion, the Court of Appeals for the District of Columbia Circuit applied the balancing test that the Supreme Court prescribed in *Skinner*, 489 U.S. at 619–33, 109 S.Ct. at 1414–21, and *Von Raab*, 489 U.S. at 665–66, 109 S.Ct. at 1390–91. At issue in *Yeutter* were several components of a drug testing program in the Food and Nutrition Service (FNS) of the United States Department of Agriculture (USDA). One of these components subjected all FNS employees to reasonable suspicion drug testing and mandated direct observation of urination for all reasonable suspicion drug testing (regardless of the level of sensitivity of the job of the particular employee). *Yeutter*, 918 F.2d at 972, 975.

The court struck down this component of the drug testing program, stating that it could "discern no weighty government interest in observation that counter-balances its intrusion on employee privacy." *Id.* at 975. The court noted that alternative procedures exist which are less intrusive but still are effective in preventing cheating on drug testing. *Id.* at 976.

The court rejected the argument implicit in the USDA's testing program that reasonable suspicion of drug use is sufficient by itself to create reasonable suspicion that the tested employee will attempt to tamper with the sample. *Id.* at 976–77. The court ordered the district court to "enjoin appellees from requiring visual observation of urination whenever an employee is ordered to undergo reasonable suspicion testing, and from authorizing observation of urination during reasonable suspicion drug tests absent an individualized determination that visual monitoring is warranted." *Id.* at 977. The court stated, "It is implicit in our holding ... that indications of drug use sufficient to warrant reasonable suspicion testing *will not necessarily establish a legitimate need to observe urination in all instances.*" *Id.* at 976 (emphasis added).

The limited nature of the emphasized language, and several other features of the *Yeutter* opinion, could lead a reasonable person to conclude that *Yeutter* does not compel the conclusion that direct observation in the circumstances challenged by the plaintiff in the case at bar would offend the Fourth Amendment. Our goal here, of course, is not to identify what we believe is the most accurate reading of *Yeutter*, or to identify the most likely implications of that case for the situation at bar. Rather, our goal is to determine whether rational (and legally informed) minds could conclude, in light of that opinion, that the question we face in Ms. Hansen's case arguably remained open.

We begin by noting that the emphasized language in the passage from *Yeutter* that we last quoted, above, could be interpreted as suggesting that there may be some situations

where reasonable suspicion of drug use can by itself justify direct observation of urination. Perhaps more significantly, the direct observation policy that was challenged in *Yeutter* was applicable to *all* FNS employees, regardless of what position they held. In another part of the opinion, the court ruled that reasonable suspicion testing based on suspicion of off-duty drug use could not be permitted with regard to all FNS employees, but was permissible with regard to workers who held "safety- or security-sensitive jobs," such as FNS motor vehicle operators. *Id.* at 974.

This portion of the *Yeutter* decision demonstrates that the balancing analysis used to measure the validity of drug testing programs under the Fourth Amendment tolerates greater intrusions on privacy for employees in "sensitive" occupations. *See also Von Raab*, 489 U.S. at 677–78, 109 S.Ct. at 1397 (upholding challenged drug testing program with regard to some occupations, but remanding for further factual development in order to determine whether employees in other occupations had sufficient access to sensitive information to justify application of the drug testing program to them). It is not clear that *Yeutter* or the balancing analysis used to measure the validity of drug testing programs would necessarily prohibit a direct observation policy for reasonable suspicion testing if that policy was applicable only to "sensitive" occupations.

The *Yeutter* court also noted that "the Supreme Court 'has quite clearly eschewed an approach to drug testing based on bright lines.'" 918 F.2d at 972 (citing *Harmon v. Thornburgh*, 878 F.2d 484, 490 n. 9 (D.C.Cir. 1989), *cert. denied*, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990)). This statement may militate against a conclusion that *Yeutter* clearly established a bright-line rule prohibiting in all contexts direct observation of urination without individualized reasonable suspicion of an intent to tamper with the sample. In addition, the *Yeutter* court acknowledged that there appeared to be tensions between the Supreme Court's opinions in *Skinner*, 489 U.S. 602, 109 S.Ct. 1402, and *Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, with regard to the legality of direct observation of

urination. *See Yeutter*, 918 F.2d at 976. These tensions will be discussed in detail below.

Hansen's argument that the direct observation of her urination was contrary to the Fourth Amendment is aided by a D.C. Circuit case which followed *Yeutter, Piroglu v. Coleman*, 25 F.3d 1098 (D.C.Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1093, 130 L.Ed.2d 1062 (1995). But like *Yeutter, Piroglu* does not necessarily compel the result that the direct observation of Hansen's urination violated the Fourth Amendment.

In *Piroglu*, a paramedic trainee alleged that a random urine drug test administered to her violated the Fourth Amendment because her urination was directly observed. *Id.* at 1100. The court restated *Yeutter*'s holding as follows: "In *Yeutter*, we held that in the absence of a particularized reasonable suspicion of tampering, an employer's visual observation of its employee's act of urination *may* render the employer's drug testing unreasonable under the fourth amendment." *Piroglu*, 25 F.3d at 1100 (emphasis added). The *Piroglu* court's use of the word "may" can be read as suggesting that direct observation of urination without particularized reasonable suspicion of tampering does not necessarily violate the Fourth Amendment in all drug testing contexts.

The court in *Piroglu* ruled that if the district court were to determine on remand that the observation of the paramedic trainee's urine test "was unobstructed and complete and was without reasonable suspicion that she would tamper with her sample, the collection of [that] sample was unreasonable under the fourth amendment." *Id.* at 1101. Thus *Piroglu* prohibited direct observation of urine testing without articulable reasonable suspicion of tampering in the context of *random* drug testing (not testing based on reasonable suspicion of drug use) of a person in a "sensitive" occupation, a paramedic trainee. And *Yeutter* prohibited direct observation without individualized suspicion of tampering in the context of drug testing based on reasonable suspicion of drug use applied to a wide range of occupations, i.e., drug testing not limited to "sensitive" occupations. However, neither of those two cases, nor any

other published decision of which we are aware, explicitly prohibits direct observation of urination without individualized reasonable suspicion of tampering in the context of "sensitive" occupations when the testing is triggered by reasonable suspicion of drug use.

The lack of such directly on-point authority is important to determining whether the defendants violated clearly established Fourth Amendment law. This is because the validity of drug testing under the Fourth Amendment is measured by a balancing test which weighs the specific government interest that is promoted by the drug testing, in a particularized setting, against the intrusion on the tested person's privacy. *See Von Raab,* 489 U.S. at 665–66, 109 S.Ct. at 1390–91. The government interest in drug testing is certainly stronger when the tested employee works in a "sensitive" occupation.

Similarly, the likelihood that direct observation of urination would be deemed to create an unjustified intrusion on privacy interests decreases when the testing is not random, but is based on reasonable suspicion of drug use. Direct observation of urination can only be justified by the possibility that the employee being tested will tamper with his or her sample. It seems reasonable to assume that only someone who actually uses drugs would have any reason to tamper with the test results. It also seems logical to assume that persons who are reasonably suspected of using drugs are more likely to actually use drugs than persons randomly tested. Since the likelihood of someone attempting to tamper with their sample would appear to increase when the testing is not random but is based on reasonable suspicion, the justifications for direct observation would also appear to be greater under reasonable suspicion testing.

Because the presence of "sensitive" occupations and the presence of reasonable suspicion of drug use both weigh in the government's favor in the balancing analysis, it is possible that a reasonable person could conclude, despite *Yeutter,* 918 F.2d at 976–77, and *Piroglu,* 25 F.3d at 1100–01, that direct observation of urination without individualized suspicion of tampering is permissible when based on reasonable suspicion and limited to employees in sensitive positions. The testing in this case is at least arguably appreciably more akin to reasonable suspicion testing than random testing, even though the agreement signed by Hansen provides for testing at random intervals, since the testing was part of a disciplinary action which followed an admission of prior drug use.

Moreover, a number of cases support the proposition that prison guards who have regular contact with inmates, such as Hansen, are "sensitive" employees with legally diminished expectations of privacy. In *McDonell v. Hunter,* 809 F.2d 1302, 1306 (8th Cir.1987), the court approved uniform testing, random testing, and reasonable suspicion testing of correctional officers, stating that prison guards have diminished expectations of privacy. In *Taylor v. O'Grady,* 888 F.2d 1189, 1201 (7th Cir.1989), the court held that a county was permitted to annually test for drugs all correctional employees who have regular contacts with inmates, but was not permitted to annually test all correctional employees in general.

In *Security & Law Enforcement Employees, District Council 82 v. Carey,* 737 F.2d 187, 204–05 (2d Cir.1984), and in *McDonell,* 809 F.2d at 1306–07, the courts approved strip searches of correctional officers on reasonable suspicion of smuggling contraband into prison, relying on the diminished expectations of privacy of prison guards. Finally, in *Profitt v. District of Columbia,* 790 F.Supp. 304, 307 (D.D.C.1991), the court upheld a body cavity search of a prison guard based on reasonable suspicion that she was smuggling drugs into the prison, stating that "diminished reasonable expectation[s] of privacy [are] accorded government employees whose duties involve public safety."

Courts have found that two general interests support increased governmental intrusions into the privacy of correctional officers who have regular contact with inmates. First, the government has an interest in maintaining prison security. Since prison inmates may be violent, drug impairment of a prison guard can lead to a breach in security and/or injury, especially since many prison guards are armed. *See Taylor,* 888 F.2d at

1196–97, 1199; *see also McDonell,* 809 F.2d at 1308.

Second, prison guards who use drugs may be more likely to smuggle drugs to prisoners, as they may need money to support their habit, as they may be subject to blackmail if prisoners know of their drug use, and as their drug use may mean that they are less reluctant to violate the law by providing others with drugs. Drug use by prisoners can increase the likelihood of a lapse in prison security or injury in the prison. *See Taylor,* 888 F.2d at 1197; *McDonell,* 809 F.2d at 1308; *Carey,* 737 F.2d at 204.

Given all of these considerations, since Hansen's case can plausibly be viewed as involving a "sensitive" employee and testing based on reasonable suspicion, a court would not necessarily be compelled by *Yeutter,* 918 F.2d at 976–77, and *Piroglu,* 25 F.3d at 1100–01, to find that the balancing used to determine the validity of drug testing programs would come out against the defendants. We remain mindful, of course, that a right can be "clearly established" even in the absence of binding precedent in this circuit, so long as an examination of all available decisional law would make it clear to a reasonable official that his intended conduct would not be approved by the courts having jurisdiction over it. *See Lum v. Jensen,* 876 F.2d 1385, 1387 (9th Cir.1989), *cert. denied,* 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990). And we acknowledge that there is considerable decisional law which, while less on-point than *Yeutter* and *Piroglu,* can be construed as increasing the likelihood that the Ninth Circuit would not approve of direct observation of urination in the circumstances of this case.

For example, we have found three opinions from courts within our Circuit that disfavor, in varying circumstances, direct observation of urination. In *American Federation of Government Employees, Local 2391 v. Martin,* 969 F.2d 788, 790 (9th Cir.1992), the appeals court reported (without obvious editorial comment) that the district court had prohibited the defendants from directly observing urination during reasonable suspicion testing of "sensitive" Department of Labor employees unless the defendants also had a reasonably-based suspicion that the persons tested might tamper with their samples. However, this particular portion of the district court's opinion was not appealed, and the district court's opinion was not published.

In *American Federation of Government Employees, Council 33 v. Thornburgh,* 720 F.Supp. 154 (N.D.Cal.1989), the court reaffirmed, after examining *Skinner,* 489 U.S. 602, 109 S.Ct. 1402, and *Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, an order which had struck down directly observed random drug testing of *all* Federal Bureau of Prisons employees. The court stated that the direct observation was a factor which made the program more intrusive than the drug testing programs approved by the Supreme Court. *Id.* at 155 n. 1.

The third of these three cases is *Sepulveda v. Ramirez,* 967 F.2d 1413, 1416 (9th Cir. 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 342, 126 L.Ed.2d 307 (1993), where the court held that a *male* officer who directly observed the urination of a *female* parolee during a drug test violated the parolee's right to bodily privacy. The court also held that the officer was not immune from liability because he had violated clearly established privacy rights. *Id.* We discuss the *Sepulveda* opinion in greater detail below, in the section that addresses plaintiff's contention that the testing to which she was subjected also violated a right to bodily privacy that receives separate protection from the Due Process Clause.

Numerous cases outside the Ninth Circuit, in addition to *Yeutter,* 918 F.2d at 976–77, and *Piroglu,* 25 F.3d at 1100–01, reflect considerable judicial misgivings about the justifiability of direct observation of urination. For example, in *Von Raab,* 489 U.S. at 672–73 n. 2, 109 S.Ct. at 1394 n. 2, the companion case to *Skinner,* 489 U.S. 602, 109 S.Ct. 1402, the Supreme Court pointed out that the procedures used in the drug testing program upheld there significantly minimized the intrusion on privacy by, among other measures, not using direct observation. In a case with some factual similarity to *Yeutter,* *American Federation of Government Employees v. Sullivan,* 744 F.Supp. 294, 305 (D.D.C.1990), a district court issued a preliminary injunction against a part of a drug testing program that required direct visual

observation during reasonable suspicion urine testing of *all* Department of Health and Human Services employees.

The court in *Ensor v. Rust Engineering Co.*, 704 F.Supp. 808, 815 (E.D.Tenn.1989), *aff'd*, 935 F.2d 269 (6th Cir.1991), upheld random drug testing of contract employees working at a nuclear research and nuclear weapons manufacturing facility, but stated that it would reconsider its ruling if the testing policy, which was silent on direct observation, was not amended to prohibit direct observation. In two decisions dealing with the same case, *Anable v. Ford*, 653 F.Supp. 22, 41 (W.D.Ark.1985), and *Anable v. Ford*, 663 F.Supp. 149, 155 (W.D.Ark. 1985), the court held that a reasonable-suspicion-based drug test of a secondary school student which involved direct observation of urination was unconstitutional, granting an injunction and damages, and denying the defendant's qualified immunity defense.

The opinion in *Storms v. Coughlin*, 600 F.Supp. 1214, 1220 (S.D.N.Y.1984), a case involving direct observation of urination, stated that urine drug testing is "entitled to the same level of scrutiny accorded to body cavity searches." This statement in *Storms* was quoted by *Tucker v. Dickey*, 613 F.Supp. 1124, 1130 (W.D.Wis.1985).

Somewhat similarly, the court in *Capua v. City of Plainfield*, 643 F.Supp. 1507, 1514 (D.N.J.1986), made the following statement about testing involving direct observation of urination:

[W]hile urine is routinely discharged from the body, it is generally discharged and disposed of under circumstances that warrant a legitimate expectation of privacy. The act itself, totally apart from what it may reveal, is traditionally private. Facilities both at home and in places of public accommodation recognize this privacy tradition. In addition, society has generally condemned and prohibited the act in public.... The requirement of surveillance during urine collection forces those tested to expose parts of their anatomy to the testing official in a manner akin to strip search exposure.... A urine test done under close surveillance of a government representative, regardless of how profes-

sionally or courteously conducted, is likely to be a very embarrassing and humiliating experience.

The *Capua* court struck down a program which subjected fire-fighters to *random*, directly observed urine testing. *Id.* at 1520. Note, however, that the *Capua* court apparently believed that random drug testing of fire-fighters was flatly unconstitutional, irrespective of the direct observation issue. *See id.* at 1517. More recent cases have upheld random testing of "sensitive" employees. *See, e.g., Ensor*, 704 F.Supp. at 814.

As is the case with *Yeutter*, 918 F.2d at 976–77, and *Piroglu*, 25 F.3d at 1100–01, none of the other numerous cases disfavoring direct observation of urination explicitly prohibit direct observation where "sensitive" employees are tested upon reasonable suspicion of drug use. However, the considerable volume of case law disapproving direct observation testing might be enough to lead us to conclude, even in the absence of binding on-point precedent, that defendants violated clearly established law, if there was no authority that appeared to point to the opposite conclusion. But there is such authority. And while it is not as voluminous as the authority that generally disfavors direct observation, it is sufficiently significant to prevent us from ruling that defendants violated clearly established law.

### 3. *Case Law Favoring the Defendants' Position.*

Our analysis of the cases that appear to favor the defendants' contention that their conduct did not violate clearly established law begins with *Skinner*, 489 U.S. 602, 109 S.Ct. 1402. The drug testing regulations at issue in that case, as stated earlier, provided for testing of federal railroad employees upon reasonable suspicion of drug use or after certain triggering events. *Id.* at 609–11, 109 S.Ct. at 1408–10. In upholding those regulations, the Supreme Court noted that "the regulations endeavor to reduce the intrusiveness of the collection process," as "[t]he regulations do not *require* that samples be furnished under the direct observation of a monitor, despite the desirability of such a procedure to ensure the integrity of

the sample." *Id.* at 626, 109 S.Ct. at 1418 (emphasis added).

However, the dissent in *Skinner* pointed out that the field manual that governed the testing at issue in fact required direct observation, and that the regulations themselves stated that direct observation, while not necessary, was the most effective means of ensuring the reliability of the sample. *Id.* at 646 & n. 8, 109 S.Ct. at 1428 & n. 8 (Marshall, J., dissenting). Thus, it is at least arguable that the majority opinion in *Skinner*, without squarely acknowledging what it was doing, approved a drug testing program where direct observation was in fact generally practiced when the employees being tested were in "sensitive" positions and the tests were based on reasonable suspicion of drug use (as opposed to tampering).

A case that more obviously weighs against a determination that the defendants violated clearly established law is *American Federation of Government Employees, Local 1533 v. Cheney,* 754 F.Supp. 1409 (N.D.Cal.1990), *aff'd,* 944 F.2d 503 (9th Cir.1991). The components of the program that were challenged in *Cheney* provided for random and post-accident testing of some Navy employees, and for reasonable suspicion testing of all civilian Navy employees. *Id.* at 1413–14.

Under the testing program, direct observation was allowed if there was reason to believe that the employee might tamper with the specimen. *Id.* at 1415. Significantly, the testing protocol provided that reasonable suspicion of drug use was "one circumstance which may provide such reason to believe that tampering is possible." *Id.* The plan did not require direct observation of all reasonable suspicion testing. *Id.* The court explained that "[u]nder the Plan, reasonable suspicion of drug use may form a basis for direct observation, but direct observation is optional, not required, based on the site coordinator's judgment, which must be documented." *Id.* at 1427. The court upheld the part of the testing program that allowed direct observation. *Id.*

Thus, *Cheney* can be interpreted as approving a drug testing program that gave the people administering the tests the discretion to order direct observation of urination solely on the grounds that there was reasonable suspicion of drug use (rather than reasonable suspicion of tampering). The force of *Cheney* is diminished somewhat by the fact that it was decided before *Yeutter,* 918 F.2d 968. In addition, while the Ninth Circuit affirmed the district court's decision, the direct observation component of the program was not considered by the Ninth Circuit, because the part of the district court's decision dealing with the direct observation issue was not appealed. *See AFGE Local 1533 v. Cheney,* 944 F.2d 503 (9th Cir.1991).

An opinion from the Court of Appeals for the Ninth Circuit that can be read as lending some support to the contention that the Fourth Amendment does not prohibit direct observation in circumstances similar to those of the instant case is *International Brotherhood of Teamsters v. Department of Transportation,* 932 F.2d 1292 (9th Cir.1991). The challenge in *Teamsters* did not focus specifically on the direct observation, so any sanction of that practice from the opinion is oblique, at best. Nonetheless, the regulations at issue in that case, which the court, at least generally, approved, included a provision for direct observation.

In upholding federal regulations that required random, periodic, pre-employment, and post-accident drug testing of commercial motor vehicle operators, the *Teamsters* court noted that the regulations limited intrusion on privacy, *id.* at 1302, as "[d]irect observation of urination [was] allowed only in narrowly defined circumstances where the monitor may reasonably suspect the integrity of the specimen." *Id.* at 1296. The import of this statement, however, is undercut by the fact that one of four "indicia warranting monitored urination" that was listed in the regulation governing direct observation was "rehabilitation or follow-up testing of an employee previously identified as using a controlled substance." *Id.* at 1296 n. 1.

The regulation approved in *Teamsters,* if applied in the circumstances faced by the plaintiff in our case, apparently would have allowed direct observation of her urination to be justified solely by the fact that she was being tested because she had admitted that

she had earlier used controlled substances. The regulation approved in *Teamsters* probably would not have *required* direct observation of Hansen's urination, however, because that regulation provided that "the concurrence of either a supervisor of the collection site monitor or an employer representative must be obtained prior to any direct observation of urination." *Id.*

*Wilcher v. City of Wilmington,* 891 F.Supp. 993 (D.Del.1995), though decided after the 1994 events at issue here, also sheds some light on whether clearly established law prohibited the conduct of the defendants. *Wilcher* demonstrates that the law had not evolved sufficiently by 1994 to prevent one court from approving a drug testing program which involved fairly intrusive supervision of urination. In that case the court ruled that a *random* drug testing program applied to fire-fighters did not violate the Fourth Amendment. *Id.* at 1002. Fire-fighters tested under the program testified that their urination was directly observed. *Id.* at 996–97. Apparently concluding (for reasons not clear) that this testimony was not credible, the court found that the program did not "involve direct observation of the genital area of the person providing the urine sample," but only "a general supervision of the specimen provider during the course of collection so as to avoid the possibility of tampering." *Id.* at 998.

Because of the tension between the testimony of the fire-fighters and the court's factual findings, it is unclear exactly what level of intrusiveness the court found the "general supervision" to entail. However, it appears that, under the court's interpretation of the program, female employees had to urinate in the presence of a same-sex supervisor standing to their side, in the same room, without any type of partition. *See id.* at 996–98. The court applied the balancing test of *Skinner,* 489 U.S. at 619–33, 109 S.Ct. at 1414–21, and *Von Raab,* 489 U.S. at 665–66, 109 S.Ct. at 1390–91, and approved the program. *See Wilcher,* 891 F.Supp. at 999–1002.

Several other cases favor the defendants' position marginally. *Tyler v. Barton,* 901 F.2d 689, 691 (8th Cir.1990), granted qualified immunity to prison officials who directly monitored a parolee's urine test, stating that whether the parolee actually had a right to unobserved urination only presented "a legitimate question." In *Molinelli v. Tucker,* 901 F.2d 13, 16 (2d Cir.1990), the court granted qualified immunity to prison officials who required a prison guard to take a drug test during which urination was directly observed. This holding, however, was based on a finding that, at the time of the events in issue (1986), it had not been clearly established that urine drug testing constituted a "search." *Id.* We note finally that in *Scaife v. Wilson,* 861 F.Supp. 1027, 1029 (D.Kan. 1994), and *Storms v. Coughlin,* 600 F.Supp. 1214, 1220 (S.D.N.Y.1984), courts approved directly observed strip search urine tests of prison inmates, relying on case law holding that body cavity searches of inmates are generally permissible.

### 4. *Plaintiff's Right under the Fourth Amendment Was Not "Clearly Established."*

If the issue before us was whether the direct observation of Hansen's urination during her drug tests violated her rights under the Fourth Amendment, we probably would hold that it did. Given the doctrinal trends evident in cases such as *Yeutter,* 918 F.2d at 976–77, and *Piroglu,* 25 F.3d at 1100–01, it is fairly likely that most federal courts eventually will take the position that the Fourth Amendment generally prohibits direct observation of urination during drug testing without reasonable, individualized, and articulable suspicion of an intent to tamper with the sample. However, the issue before us is not what the law is or where it is likely to go, but whether the law was clearly established at the time of the conduct giving rise to this action.

As we indicated at the beginning of our review of the pertinent authorities, at the time the defendants engaged in the conduct that plaintiff challenges here, there was no reported opinion that squarely addressed the instant issue. There was no clearly controlling authority—and the cases that favor plaintiff's position, while strong in tone, left open the possibility of different outcomes in settings where different interests were at

stake. *Yeutter,* 918 F.2d at 976–77, and *Piroglu,* 25 F.3d at 1100–01, the opinions most favorable on these issues to plaintiff, are distinguishable because neither prohibited direct observation of urination when *both* reasonable suspicion of drug use and "sensitive" employees were involved.

Moreover, there were other cases in which defendants could find some support for the view that, in the specific circumstances presented by Hansen's situation, the direct observation did not offend Fourth Amendment norms. In *Skinner,* 489 U.S. 602, 109 S.Ct. 1402, for example, a majority of the justices on the Supreme Court (over a vigorous dissent) appeared to approve, *sub silentio,* a drug testing program where direct observation was the actual practice, at least in most circumstances. And in *Cheney,* 754 F.Supp. 1409, a court in this district appeared to approve a testing regimen in which direct observation of urination could be justified solely on the ground that there was reasonable suspicion that the person being tested had used drugs.

Given all the considerations described above, and the difficulty, generally, of predicting outcomes of specific balancing analyses that have not yet been undertaken by any court, we cannot conclude that the Fourth Amendment right plaintiff invokes here was "clearly established" during 1994. That conclusion compels us to hold that the individual defendants are entitled to qualified immunity from Hansen's Fourth Amendment damages claim—and thus to direct entry of summary judgment in their favor on that claim.

**C.** ***Plaintiff's Contention that Defendants' Conduct Violated a "Clearly Established" Separate Right of Bodily Privacy, Protected Independently by the Due Process Clause.***

█ Aided by three opinions issued by the Court of Appeals for the Ninth Circuit, plaintiff appears to contend that defendants' conduct (ordering the direct observation of her urinating) violated a separate right of bodily privacy that is not dependent on or rooted solely in the Fourth Amendment's prohibition against unreasonable searches and seizures, but that has independent sources in the Due Process Clause (here of the Fourteenth Amendment) and, perhaps, in the penumbras of other amendments. Plaintiff further contends that it was clearly established in 1994 that subjecting her to direct observation while urinating in the circumstances presented by her case violated this independent constitutional right.

It is not at all clear, *when the governmental conduct that is being challenged constitutes a "search,"* and therefore triggers protections under the Fourth Amendment, that the federal courts would recognize a separate privacy right that would compel the courts to apply to the governmental conduct an additional, independent and more demanding constitutional test. Stated differently: while the right to privacy may have roots in several different provisions of the Constitution, it is unlikely that when the government conduct that invades that right clearly constitutes a "search" the courts would subject that conduct to additional tests if it satisfied the requirements that arise out of the Fourth Amendment. At a minimum, we conclude, with no difficulty, that it was not clearly established in 1994 that the conduct of the defendants in the case at bar would be subjected to a separate, more demanding constitutional test if that conduct survived a challenge under the Fourth Amendment. Nor was it clearly established that defendants' conduct would have failed such a separate test, had it been applied.

The three Ninth Circuit cases lending support to Hansen's right to bodily privacy argument are *York v. Story,* 324 F.2d 450 (9th Cir.1963), *cert. denied,* 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964); *Grummett v. Rushen,* 779 F.2d 491 (9th Cir.1985); and *Sepulveda v. Ramirez,* 967 F.2d 1413 (9th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 342, 126 L.Ed.2d 307 (1993). *York,* 324 F.2d 450, is the earliest Ninth Circuit case dealing with the right to bodily privacy. In that case, the court held that the Due Process Clause of the Fourteenth Amendment would prohibit police from taking photographs of a complaining witness in the nude, over her objection, for no law enforcement purpose. *Id.* at 456.

In *Grummett,* 779 F.2d 491, the Ninth Circuit described an analytical framework for determining whether the right to bodily privacy has been violated. Relying on *Roe v. Wade,* 410 U.S. 113, 115, 93 S.Ct. 705, 708, 35 L.Ed.2d 147 (1973), the Supreme Court's seminal abortion decision, the Ninth Circuit stated that "since the right of privacy is a fundamental right it may be restricted only if the limitation is justified by a 'compelling state interest.'" *Grummett,* 779 F.2d at 494. The court also required the state interest to be achieved by "the least intrusive means." *Id.* at 494. In *Grummett,* the court found that a prison policy which allowed female guards to view male prisoners while dressing, showering, and using toilet facilities did not violate the right to bodily privacy, as the viewing by females was generally infrequent, obscured, and/or from a distance. *Id.* at 494–95.

The Ninth Circuit considered the right to bodily privacy again in 1992—on that occasion in the context of drug testing. In *Sepulveda,* 967 F.2d 1413, a male parole officer allegedly had directly observed a female parolee urinating during a drug test. *Id.* at 1415. Without explaining its reasoning, the court held that, if proved, this conduct by the officer violated the parolee's right to bodily privacy. *Id.* at 1416. Furthermore, the court denied the officer's qualified immunity claim, holding that the right was clearly established at the time the officer's conduct took place, and that a reasonable officer would have known that the conduct at issue violated the parolee's rights. *Id.*

While not directly doing so in her papers, plaintiff might argue, based on *York, Grummett,* and *Sepulveda,* that she has a right of bodily privacy in this setting that is not dependent on the scope of her rights under the Fourth Amendment, but that has independent roots in at least the Due Process Clause. She also might argue that defendants' conduct must survive a separate and more demanding test under the Due Process Clause (and/or the penumbra of other provisions of the Constitution)—even if it could survive a challenge based on the Fourth Amendment. More specifically, plaintiff might argue that her separate right to bodily

privacy is "fundamental"—and, therefore, that governmental conduct that invades this right can withstand constitutional scrutiny only if the defendants can pass the compelling state interest test. *Cf. Grummett,* 779 F.2d at 494. That test imposes much higher demands on the defendants than the balancing test that the courts use to protect privacy interests under the Fourth Amendment.

To pass the compelling state interest test, the burden would be on the governmental defendants to show both that the interests actually pursued through the challenged conduct were important enough to be deemed "compelling" and that there were no alternative means through which the government could achieve its ends that would entail an appreciably smaller invasion of the plaintiff's fundamental right. Because the second prong of this test requires the government to prove a negative, it is very difficult to pass.

As indicated, above, I am not at all sure that in situations where the government's conduct constitutes a "search," the federal courts would subject that conduct to two different constitutional tests, one under the Fourth Amendment and one under the Due Process Clause (of the Fifth and Fourteenth Amendments). While there is no abstract or theoretical barrier to the notion that the same governmental conduct could simultaneously invade rights that are protected by different constitutional provisions, or to the notion that different provisions of the constitution can serve as sources of different tests, the likelihood that the courts would subject the government to two different tests in the kind of setting we face here strikes me as remote, indeed. I will explain why.

First, I note that the two cases that serve as the original Ninth Circuit sources for the notion that there is a separate right of bodily privacy, rooted in the Due Process Clause, *York,* 324 F.2d 450, and *Grummett,* 779 F.2d 491, were decided well before the Supreme Court published its opinions in *Skinner,* 489 U.S. 602, 109 S.Ct. 1402, and *Von Raab,* 489 U.S. 656, 109 S.Ct. 1384. And *Skinner* and *Von Raab* are designed to set forth a basic analytical framework for protecting privacy rights against the kinds of invasions in issue here—when the governmental conduct

amounts to a "search" within the meaning of the Fourth Amendment.

Second, the only Ninth Circuit opinion in this area that was published after *Skinner* and *Von Raab, Sepulveda v. Ramirez,* 967 F.2d 1413, does not describe, endorse, or apply any analytical model (test) at all. *Sepulveda* does speak of a "right to bodily privacy," *id.* at 1415, and does cite *York* and *Grummett* with approval. *Id.* at 1415–16. However, it never discusses what the sources of the "right to bodily privacy" are, thereby failing to affirm *York's* suggestion that the right is derived from the Due Process Clause of the Fifth and Fourteenth Amendments. *Cf. York,* 324 F.2d at 455. And it does not discuss what standards should be used to judge alleged violations of the "right to bodily privacy," thereby failing to affirm *Grummett's* application of a compelling state interest/least intrusive means test. *Cf. Grummett,* 779 F.2d at 494. Instead, *Sepulveda* simply announces that the conduct by the defendant, if proved, would violate a clearly established "right to bodily privacy." *See* 967 F.2d at 1415–16.

Third, it is arguable that what drives all three of the Ninth Circuit cases in this "line" to suggest that there is a right of bodily privacy with roots in the Constitution that are independent of the Fourth Amendment is the judges' uncertainty about whether the specific government action challenged in each of those cases would be deemed (by the Supreme Court) as being covered by the Fourth Amendment's prohibition on unreasonable "searches." In two of the cases (*York* and *Sepulveda* ), since the conduct was so obviously offensive, the judges may have felt constrained to find a constitutional source of protection that was not dependent on the arguably politicized vagaries of Fourth Amendment doctrine. Moreover, if the conduct that was challenged in those cases was deemed not to constitute a "search," there would be no risk that rooting protections in some other amendment, and imposing, through that amendment, a separate, more demanding test, would expose the government to two different tests (one very difficult to pass) when the government's conduct clearly did constitute a search.

Finally, I point to a strong suggestion in a very recent opinion from the Supreme Court that it would not tolerate an effort to impose on law enforcement a compelling state interest test when the activity that is being challenged clearly constitutes a "search." In *Vernonia School District 47J v. Acton,* ——— U.S. ———, ——— ——, 115 S.Ct. 2386, 2394–96, 132 L.Ed.2d 564 (1995), the high court, in reviewing the constitutionality of a drug testing program for public school athletes, insisted on proceeding under the Fourth Amendment's balancing test and expressly rejected the suggestion that, even as part of such a balancing test, the government should be required to demonstrate a compelling state interest or to show that its procedures represented the least intrusive means of achieving its ends. The Court stated, "[w]e have repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment." *Id.* at ———, 115 S.Ct. at 2396 (citing *Skinner,* 489 U.S. at 629 n. 9, 109 S.Ct. at 1420 n. 9). In a footnote, the Court went on to emphasize its view, suggested much earlier in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), that " 'elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.' " *Vernonia,* at ——— n. 3, 115 S.Ct. at 2396 n. 3 (quoting *Bell,* 441 U.S. at 559 n. 40, 99 S.Ct. at 1885 n. 40).

It does seem likely that the barriers to effective law enforcement would be high indeed if, before every search, the government had to be satisfied not only that the search was reasonable under all the circumstances (as the Fourth Amendment requires), but also that there were no less intrusive means by which to achieve the goals being pursued through the search. Moreover, to subject this kind of government activity ("searches" within the meaning of the Fourth Amendment) to the compelling state interest test would, in one stroke, topple (by making it irrelevant) the whole edifice of Fourth Amendment jurisprudence that the high court has struggled over so many years to create. In that edifice (clearly too generous a word, but it makes the point), the Court has attempted to balance, sometimes deli-

cately, the competing governmental and privacy interests. If the government were also subjected to the compelling state interest test every time it conducted a search, those many balances (in varying settings) that the Court has labored to fashion would be wiped out. I simply can't imagine the Court permitting the doctrinal and law enforcement chaos that would ensue.

The discussion in the preceding paragraphs should demonstrate why we cannot conclude that the defendants' conduct in the case at bar, conduct that clearly constituted a "search" for purposes of the Fourth Amendment, violated a "clearly established" right under the Due Process Clause (or under any other Amendment). We also point out that *York*, 324 F.2d 450, *Grummett*, 779 F.2d 491, and *Sepulveda*, 967 F.2d 1413, are each factually distinguishable from the controversy before us. Each of those three cases concerned observation of unclothed bodies by persons of the opposite sex. Here, the observation was conducted by a person of the same sex as the plaintiff; such observation is generally considered to be much more socially acceptable.

Yet another consideration supports our conclusion that the defendants' conduct did not violate a right that was clearly established under a constitutional source other than the Fourth Amendment. It is arguable, even in contexts that do not involve a "search" for purposes of the Fourth Amendment, that the *Grummett* compelling interest/least intrusive means analysis may no longer be valid. A short time after the Ninth Circuit published *Sepulveda*, the Supreme Court issued its fractured opinion in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Recall that *Grummett* relied on the seminal abortion decision *Roe v. Wade*, 410 U.S. at 115, 93 S.Ct. at 708, in stating that a compelling interest is required to justify government intrusions on bodily privacy. *See Grummett*, 779 F.2d at 494. In *Casey*, however, a Supreme Court plurality analyzed abortion restrictions not under the compelling interest/narrowly tailored means framework, but under a less demanding "undue burden" test. *Compare Casey*, 505 U.S.

at 876–77, 112 S.Ct. at 2820–21 (opinion of O'Connor, Kennedy, and Souter, J.J.) (adopting "undue burden" test) *with id.* at 929–30, 112 S.Ct. at 2847–48 (Blackmun, J., concurring in part and dissenting in part) (advocating continued use of compelling interest/narrowly tailored means scrutiny). Though the "undue burden" standard has never been adopted by a majority of the Supreme Court, and has been criticized as lacking sound theoretical underpinnings, *see, e.g., id.* at 964, 112 S.Ct. at 2865 (Rehnquist, C.J., concurring in part and dissenting in part), it would not be clearly unreasonable to view its use by the *Casey* plurality as undermining the continued vitality of *Grummett*'s compelling interest analysis.

For all the reasons set forth in the preceding paragraphs, we cannot say that defendants' conduct violated clearly established law arising from any federal constitutional source outside the Fourth Amendment. It follows that the individual defendants also are protected by qualified immunity from any claims that purport to be based on federal sources of protection of plaintiff's privacy other than the Fourth Amendment. We hereby order entry of summary judgment in favor of all the individual defendants on the second claim in Hansen's complaint, the claim for damages based on an alleged invasion of her "right to bodily privacy."

### D. *The Claim Based on Alleged Failure to Train*

Hansen argues that summary judgment should be granted on her claim of damages based on failure to train. The failure to train claim alleges that Hansen's constitutional rights were violated because defendants Gomez and Vasquez failed to adequately train or supervise defendants Russell and Kim. However, the underlying rights that Hansen contends were violated are her Fourth Amendment and bodily privacy rights. Since the individual defendants are immune from the Fourth Amendment and federal bodily privacy claims, they must also be immune from any failure to train claim founded upon those two claims. We therefore grant summary judgment to these four defendants on Hansen's failure to train claim.

# 1500

## V. CALIFORNIA CONSTITUTIONAL RIGHT TO PRIVACY

### A. *Jurisdiction*

■ Because we are granting summary judgment (based on qualified immunity) in favor of all the individual defendants on all of Hansen's federal law damages claims, and because we will be ordering the dismissal of all other federal claims, we must determine, before proceeding, whether it is appropriate to continue to exercise jurisdiction over Hansen's state law claims. A federal court has the discretion to continue to exercise jurisdiction over supplemental state law claims even after it has dismissed all federal claims. *See* 28 U.S.C.A. § 1367(c)(3) (West 1993) ("The district court *may* decline to exercise supplemental jurisdiction ... if ... the district court has dismissed all claims over which it has original jurisdiction.") (emphasis added).

The Practice Commentary that accompanied the adoption of 28 U.S.C.A. § 1367 provides considerable guidance on when federal courts should maintain jurisdiction over supplemental state law claims after dismissing all federal claims:

> Whether a dismissal of the touchstone claim should bring about a dismissal (or remand, in a removal situation) of the dependent claim for want of supplemental jurisdiction should hinge on the moment within the litigation when the dismissal of the touchstone claim takes place, and on the other surrounding circumstances. If for example, the main claim is dismissed early in the action, before any substantial preparation has gone into the dependent claims, dismissing or remanding the latter upon declining supplemental jurisdiction seems fair enough. But *if the dismissal of the main claim occurs late in the action, after there has indeed been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair. Nor is it by any means necessary.* The discretion implicit in the word "may" in subdivision (c) of § 1367 permits the district court to weigh and balance all of these factors.

28 U.S.C.A. § 1367 Practice Commentary at 835–36 (1993) (emphasis added).

In addition, case law holds that factors which courts can consider in determining whether to retain jurisdiction over state law claims after all federal claims have been dismissed include "economy, convenience, fairness, and comity." *Imagineering, Inc. v. Kiewit Pac. Co.,* 976 F.2d 1303, 1309 (9th Cir.1992), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993); *see also Wright v. Associated Ins. Cos., Inc.,* 29 F.3d 1244, 1251 (7th Cir.1994); *Growth Horizons, Inc. v. Delaware County, Pa.,* 983 F.2d 1277, 1284 (3d Cir.1993). The Ninth Circuit "frequently has upheld decisions to retain pendent claims on the basis that returning them to state court would be a waste of judicial resources." *Imagineering,* 976 F.2d at 1309.

■ This case has been pending for nearly a year and one-half. It has been assigned to four different judges. Most of the discovery has been completed. There are two recent California Supreme Court decisions, *Caldwell v. Montoya,* 10 Cal.4th 972, 42 Cal. Rptr.2d 842, 897 P.2d 1320 (1995), and *Hill v. National Collegiate Athletic Ass'n,* 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 P.2d 633 (1994), which provide clear and detailed guidance for resolving the California immunity and privacy law issues which Hansen's case raises. Moreover, the main California law issues can be decided at the summary judgment stage, as we shall see below.

It would be unfair to the litigants to force them to start anew in state court, and it would be wasteful to force California courts to expend resources on a case which this court can move toward final resolution much more efficiently. For these reasons, we will exercise the discretion with which we are vested in regard to such matters by retaining jurisdiction over Hansen's California law claims.

### B. *California Statutory Immunity*

California has no qualified immunity law similar to federal qualified immunity. Instead, it has statutory absolute immunity, shielding public employees from liability for "an injury resulting from [the employee's] act or omission where the act or omission

was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal.Gov't Code § 820.2 (West 1995).

In a recent case, *Caldwell v. Montoya*, 10 Cal.4th 972, 42 Cal.Rptr.2d 842, 897 P.2d 1320 (1995), the California Supreme Court reaffirmed *Johnson v. California*, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968), a case that defined the meaning of "discretion" as used in Cal.Gov't Code § 820.2. In *Caldwell*, the court stated:

> *Johnson* concluded [that] a "workable definition" of immune discretionary acts draws the line between "planning" and "operational" functions of government. Immunity is reserved for those *"basic policy decisions* [which have] . . . been [expressly] committed to coordinate branches of government," and as to which judicial interference would thus be "unseemly." . . .
>
> *On the other hand, said Johnson, there is no basis for immunizing lower-level, or "ministerial," decisions that merely implement a basic policy already formulated.* Moreover, we cautioned, immunity applies only to *deliberate and considered* policy decisions, in which a "[conscious] balancing [of] risks and advantages . . . took place. The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision."

42 Cal.Rptr.2d at 847, 897 P.2d at 1325–26 (citations omitted) (double emphasis added). In a later passage, the court repeated that "a *conscious balancing of risks and benefits* [is] necessary to qualify for immunity" and that " 'the specific conduct giving rise to the suit' [must] involve an *actual* exercise of discretion." *Id.* at 848, 897 P.2d at 1327 (quoting *Johnson*, 73 Cal.Rptr. at 249 n. 8, 447 P.2d at 361 n. 8).

In this case, defendants Vasquez, Russell, and Kim all testified that their actions with regard to the direct observation of Hansen's urine testing were in accordance with a policy set higher up. The three did not engage in a "conscious balancing of risks and benefits" concerning the direct observation of Hansen's urination. *Cf. Caldwell*, 42 Cal. Rptr.2d at 849, 897 P.2d at 1327. They

"merely implement[ed] a basic policy already formulated." *Cf. id.* 42 Cal.Rptr.2d at 847, 897 P.2d at 1326. Moreover, this is not a case where judicial interference with a basic policy decision made by the executive branch would be "unseemly," *cf. id.*, since it is the judicial branch which is the final arbiter of whether government actions violate constitutional rights—like the right to privacy.

Thus, defendants Vasquez, Russell, and Kim are not entitled to immunity under Cal.Gov't Code § 820.2. Since the record is silent about whether defendant Gomez, the CDC director, played a role in the formulation of the direct observation policy or merely implemented a policy set by the California Department of Personnel Administration, we cannot decide whether Gomez is entitled to immunity under Cal.Gov't Code § 820.2 at the summary judgment stage.

One thing that is clear at this stage is that none of the defendants are entitled to immunity under Cal.Gov't Code § 820.6. That section states, "If a public employee acts in good faith, without malice, and under the apparent authority of an *enactment* that is unconstitutional, invalid or inapplicable, he is not liable for an injury caused thereby except to the extent that he would have been liable had the *enactment* been constitutional, valid and applicable." (Emphasis added.)

Cal.Gov't Code § 810.6 defines " '[e]nactment' " as a "constitutional provision, statute, charter provision, ordinance or regulation." Cal.Gov't Code § 811.6 defines " '[r]egulation' " as "a rule, regulation, order or standard, having the force of law, adopted by an employee or agency of the United States pursuant to the federal Administrative Procedure Act . . . or as a regulation by an agency of the state pursuant to the [state] Administrative Procedure Act."

The direct observation policy followed by CDC does not rise to the level of an "enactment." The California Department of Personnel Administration (DPA) regulation governing drug testing sample collection procedures, Cal.Code Regs. tit. 2 § 599.963 (1988), provides the following:

(d) Test samples will be collected in a clinical setting such as a laboratory collection station, doctor's office, hospital or clinic or in another setting approved by the department on the basis that it provides for at least an equally secure and professional collection process. *The department shall specify procedures to ensure that true samples are obtained.*

(e) *The department shall specify measures to ensure that a strict chain of custody is maintained for the sample from the time it is taken, through the testing process,* to its final disposition.

(Emphasis added.)

This regulation is silent about whether urine testing should be directly observed. It merely gives the "department" discretion to specify procedures to make sure that valid samples are obtained. "Department" as used in the regulation is defined by Cal.Code Regs. tit. 2 § 599.604 as "the Department of Personnel Administration of the State of California." This suggests that the direct observation policy followed by the CDC may be a policy set by the DPA under the authority of Cal.Code Regs. tit. 2 § 599.963(d)–(e). But regardless of who formulated it, the policy is not an "enactment," since it was not codified as a regulation.

Thus, unlike under federal law, the fact that defendants Vasquez, Russell, and Kim were following a policy which was not clearly unconstitutional cannot provide them with immunity. At first glance, this may seem to be a somewhat strange and unfair result, for under California law immunity is available to those who formulate a policy and to those who apply a regulation or other enactment, but immunity is not available to people who follow a policy directive that has not been converted into a regulation. A closer look at California immunity law, however, will demonstrate that the result is not unfair and rests on solid public policy grounds.

In *Caldwell,* the court stated that the California Tort Claims Act "provides that a public employee sued personally for performance of duties may obtain both defense and indemnity from the employer, absent bad faith." 42 Cal.Rptr.2d at 847, 897 P.2d at 1325 (citing Cal.Gov't Code § 825). The court added

that "[h]ence, fears that personal exposure to damages suits and judgments would deter the vigorous performance of public responsibilities are no longer a policy basis for immunity." *Id.* (citing *Johnson,* 73 Cal.Rptr. at 246, 447 P.2d at 358). It follows that exposing defendants to liability in the circumstances of this case will not be unfair, as they have access to defense and indemnity from CDC.

In addition, providing immunity for actions taken pursuant to a valid regulation or other enactment, but not for actions performed in accordance with an uncodified "policy," appears to us to be sound public policy. It provides government agencies an incentive to codify as regulations important policy decisions, especially those that may infringe constitutional rights, in order to avoid having to later indemnify their employees. Codifying important policy decisions as regulations presumably subjects those decisions to increased public and legal scrutiny, making it less likely that the decisions will abridge rights of the public or of government employees, and making it more probable that the decisions will be wise and accepted by those affected by them.

■ While Cal.Gov't Code § 820.6 does not help any of the defendants, there is one more provision in the California immunity statutes which may aid some of the defendants. Cal.Gov't Code § 820.8 shields public officials from *respondeat superior* liability, stating, "Except as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person. Nothing in this section exonerates a public employee from liability for injury proximately caused by his own negligent or wrongful act or omission." Defendants Russell and Kim cannot benefit from this section, since Kim supervised Hansen's urine tests and Russell instructed Kim that the tests were to be directly observed.

We cannot determine, however, from the record as thus far developed, whether defendant Vasquez, Soledad's warden, took any action which proximately caused Hansen's urination to be directly observed. On one hand, defendants' counsel admitted that Vasquez is responsible for implementing CDC policies, and Vasquez testified that the drug

testing of Hansen was conducted under his authority. In addition, Vasquez communicated with a superior at CDC concerning the direct observation policy after a union representative complained to him about Hansen's objections to direct observation. On the other hand, there is no specific evidence in the record that Vasquez ever instructed Russell or Kim that drug testing of correctional officers should occur under direct observation or that Hansen's urine testing should be directly observed.

It is possible (but not obviously likely) that the direct observation policy was handed down to Russell and Kim through channels not involving Vasquez. Thus, we cannot determine at the summary judgment stage whether Cal.Gov't Code § 820.8 immunizes Vasquez. Likewise, since the record contains scant evidence about defendant Gomez's actions, we cannot determine at this stage whether Cal.Gov't Code § 820.8 protects Gomez, though, due to his position as CDC's director, it does not seem likely that he will benefit from the provision.

Since defendants Russell and Kim did not exercise discretion when they required Hansen's urination to be observed, but were merely following a policy not codified as a regulation, no provision in California law provides them with immunity. Therefore we find, as a matter of law, that Russell and Kim are not entitled to immunity from Hansen's damages claim under California privacy law. However, we cannot rule on defendant Gomez's request for immunity at this point because the record is silent about whether he exercised discretion in a manner that caused Hansen's urination to be directly observed, and about whether he took any other action proximately causing Hansen's urination to be directly observed. We likewise cannot rule on defendant Vasquez's request for immunity, for we also cannot determine from the record whether he proximately caused Hansen's urination to be directly observed.

## C. *California Constitutional Right to Privacy*

### 1. *Privacy Action Elements and Defenses.*

Article I, section 1 of the California Constitution states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*." (Emphasis added.) Hansen contends that the direct observation of her urination violated the right to privacy guaranteed by the California Constitution.

The California Supreme Court set out clear and detailed guidelines for courts to follow in addressing alleged violations of California's right to privacy in *Hill v. National Collegiate Athletic Ass'n*, 7 Cal.4th 1, 26 Cal. Rptr.2d 834, 865 P.2d 633 (1994). In *Hill*, the court upheld random drug testing of student athletes by the National Collegiate Athletic Association (NCAA), even though the NCAA's testing program required direct observation of urination. *Id.* 26 Cal.Rptr.2d at 866, 871, 865 P.2d at 664, 669. But, as we shall see, under the guidelines set forth in *Hill*, the direct observation of Hansen's urination violated Hansen's California constitutional right to privacy.

Under *Hill*, a right to privacy claim has three elements. "The first element of a state constitutional cause of action for invasion of privacy is the identification of a specific, legally protected privacy interest." *Id.* 26 Cal.Rptr.2d at 856, 865 P.2d at 654. "Legally recognized privacy interests" include "conducting personal activities without observation, intrusion, or interference." *Id.* "The second essential element of a state constitutional cause of action for invasion of privacy is a reasonable expectation of privacy on plaintiff's part." *Id.* 26 Cal.Rptr.2d at 856, 865 P.2d at 655. The third element is that "[a]ctionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Id.* 26 Cal.Rptr.2d at 857, 865 P.2d at 655.

If all three of these elements are established, *Hill* requires the plaintiff's privacy interest to be balanced against counter-

vailing interests of the defendant. "Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest." *Id.* 26 Cal.Rptr.2d at 857, 865 P.2d at 655–56. "Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests." *Id.* 26 Cal.Rptr.2d at 857, 865 P.2d at 656.

Even if the defendant demonstrates a countervailing interest, "[p]laintiff, in turn, may rebut a defendant's assertion of countervailing interests by showing there are feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests." *Id.* 26 Cal.Rptr.2d at 859, 865 P.2d at 657. "[P]laintiff may undertake the burden of demonstrating the availability and use of protective measures, safeguards, and alternatives to defendant's conduct that would minimize the intrusion on privacy interests." *Id.* 26 Cal.Rptr.2d at 857, 865 P.2d at 656. "[I]f defendant's legitimate objectives can be readily accomplished by alternative means having little or no impact on privacy interests, the prospect of actionable invasion of privacy is enhanced." *Id.*

### 2. *Legally Protected Privacy Interest.*

■ We obtain further guidance in applying the *Hill* framework to the facts of this case from the manner in which the framework was applied to the NCAA's drug testing program. The California Supreme Court found that the NCAA program's monitoring of urination impacted a legally protected privacy interest, for the program "intrude[d] on a human bodily function that by law and social custom is generally performed in private and without observers." *Id.* 26 Cal. Rptr.2d at 859, 865 P.2d at 657. Likewise, the observation of Hansen's urination invaded the legally protected privacy interest in "conducting personal activities without observation, intrusion, or interference." *Cf. id.* 26 Cal.Rptr.2d at 856, 865 P.2d at 654.

### 3. *Expectation of Privacy and the MOU.*

The *Hill* court found that NCAA student athletes had diminished expectations of privacy. *Id.* 26 Cal.Rptr.2d at 859–60, 865 P.2d at 658–59. Nevertheless, the court also found that direct observation of urination was such an invasive procedure that the student athletes had reasonable expectations of privacy in that they could reasonably expect their urination not to be directly observed. *Id.* 26 Cal.Rptr.2d at 860, 866, 865 P.2d at 659, 664. The *Hill* court therefore concluded that further inquiry regarding countervailing state interests and less intrusive means was justified. *Id.* 26 Cal.Rptr.2d at 860, 865 P.2d at 659.

Applying these guidelines from *Hill,* it is clear that further inquiry will be justified in the case at bar if Hansen's reasonable expectations of privacy are not appreciably lesser than the reasonable expectations of privacy of the student athletes. As we examine this issue, we must bear in mind that the focus here is not on expectations of privacy generally, but expectations *with respect to direct observation of urination, specifically.* As a prison guard, Hansen presumably knew that she would not enjoy the full range of insulation from governmental intrusions that a civilian who was not employed in a sensitive position would expect to enjoy. And she knew, of course, that she had agreed to random drug testing (through urinalysis) as a condition to continuing employment. What she insists she had not voluntarily agreed to, however, was the specific, deeply invasive component of the testing that consisted of a staff person directly observing her urination. It is the legitimacy of her expectation of privacy with respect to that particular component of the testing that is the central issue at this juncture in our analysis.

*Hill* stated that the pertinent expectations of privacy of the student athletes were diminished for two reasons. First, college athletes routinely endure significant losses of privacy. For example, they regularly undress in communal locker rooms in the presence of others of the same sex. *Id.* 26 Cal.Rptr.2d at 859, 865 P.2d at 658. By contrast, we have been presented with no evidence that prison guards routinely experience similar invasions of privacy.

Second, under *Hill,* "the presence or absence of opportunities to consent voluntarily

to activities impacting privacy interests obviously affects the expectations of the participant." *Id.* 26 Cal.Rptr.2d at 857, 865 P.2d at 655. The NCAA program provided notice to the athletes of the drug testing and the opportunity to consent to the drug testing. *Id.* 26 Cal.Rptr.2d at 860, 865 P.2d at 659. Those who did not consent were disqualified from competition. *Id.* According to the *Hill* court, the consent of the athletes was still voluntary, since there is "no legal right to participate in intercollegiate athletic competition," and the athletes consented by choosing to participate with knowledge of the rules. *Id.*

By contrast, Hansen's consent to drug testing involving direct observation cannot be deemed to have been truly voluntarily. If she had not consented to the drug testing, she would have almost certainly been fired from her job. Unlike participating in collegiate athletics, working for a living is not something that most of us can choose to do or not do—it is an economic necessity. In addition, there is no evidence in the record that Hansen had actual notice that her drug testing would be directly observed before she signed the drug testing agreement. There is testimony in the record that a union representative told Hansen before her first drug test that there would be no direct observation.

Defendants argue that Hansen's union, the CCPOA, agreed to direct observation of urination in the MOU, the collective bargaining agreement with the CDC. Defendants suggest that Hansen waived any constitutional rights she may have had against direct observation of urination when her union signed the MOU. We need not consider, however, whether and to what extent a union may waive constitutional rights of its members. No reasonable fact-finder could interpret the MOU as an express agreement by the union approving direct observation of urine testing. Instead, the record indicates that, at most, the union only agreed to disagree with the CDC about whether direct observation would take place, with the knowledge that it had been taking place and would probably continue to take place.

As stated earlier, the MOU provision at issue reads:

> During the term of this agreement, the State agrees to *study the need to retain direct observation* of the employee providing the urine sample, and will meet and confer with CCPOA upon completion of the study, or upon CCPOA request. The State and CCPOA may also mutually agree to modify this section in response to new technology or other improved procedures.

(Emphasis added.) No other provision of the MOU discusses or permits direct observation. On its face, without consideration of extrinsic evidence, the quoted provision does not explicitly permit direct observation. A provision explicitly permitting direct observation would simply state that drug testing shall take place under direct observation. The quoted provision appears to simply acknowledge that direct observation is taking place, and suggests that there is disagreement as to whether direct observation is appropriate.

Examination of evidence concerning the negotiation of the MOU strengthens this conclusion. In signed declarations, CCPOA negotiators stated that, during the negotiation of the MOU, the union never agreed to direct observation of correctional officers, the union argued that direct observation violated the constitutional rights of correctional officers, and the union threatened that direct observation could result in a lawsuit against the state. Buddingh Decl. at 1–2; Virga Decl. at 1–2.

The testimony of David Gilb, a negotiator for the state who participated in the negotiation of the MOU, *see* Gilb Dep. at 9, does not contradict the statements of the union negotiators when examined in its entirety. When asked whether the MOU permits direct observation, Gilb stated, "It is silent, doesn't speak to it." Gilb Dep. at 18.

Gilb later claimed, however, that "[a]n agreement was reached with the union fully understanding we were going to have direct observation. You won't find it in the policy, but when we were at the bargaining table— we have an obligation to tell them how we are going to do it." Gilb Dep. at 19. Gilb

also testified that while direct observation was an "intense" issue during negotiations, the union did not fight to an impasse over the issue. Gilb Dep. at 18, 20; *see also* Gilb Decl. at 3. While Gilb's testimony indicates that the union understood that there was a strong possibility that direct observation would continue to occur, his testimony is not enough for a reasonable fact-finder to conclude that the union actually approved or agreed to direct observation.

A settlement agreement between CDC and CCPOA concerning an employee grievance about drug testing procedures further supports the conclusion that the union and CDC did not actually agree on the direct observation issue, but only agreed to disagree. The agreement apparently was reached around the same time that negotiations of the MOU were drawing to a close—the agreement is dated September 9, 1992, and the MOU was in effect from September 18, 1992 through June 30, 1995.

The settlement agreement stated that "the parties agree that the issue of whether direct or frontal observation of . . . employees during the collection of urine samples violates any employee rights of privacy is not resolved by this grievance and that neither CCPOA nor the State waives any position or argument regarding this issue." Russell Decl., Ex. B. Furthermore, one of the defendants, Russell, testified that his understanding of the labor situation was that CCPOA and CDC had "agreed to disagree" on the issue of direct observation. Russell Dep. at 39.

The MOU itself and the evidence relating to its negotiation cannot support a conclusion that the union explicitly agreed to direct observation of urination. It is best interpreted as an agreement to disagree, with the union knowing that direct observation was likely to continue to occur. It certainly does not rise to the level of a waiver of constitutional rights by the union on behalf of its members. A waiver of constitutional rights must be voluntary, knowing, and intelligent, and it must be established by clear and convincing evidence. *See Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390, 1394 (9th Cir.), *cert. denied*, 501 U.S. 1252,

111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991); *Erie Telecommunications, Inc. v. City of Erie, Pa.*, 853 F.2d 1084, 1094 (3d Cir.1988).

Since Hansen never voluntarily consented to direct observation of her urine drug testing, either on her own or through her union, her reasonable expectations of privacy are greater than those of the student athletes in *Hill.* Recall that the court in *Hill* found that, in a real sense and to a significant degree, the students had voluntarily consented to the full testing regimen, including the direct observation component, by choosing to participate in athletic competition. *See* 26 Cal.Rptr.2d at 860, 865 P.2d at 659. It is especially important to recall further that the *Hill* court found that the invasion of privacy created by direct observation of urination was so serious that reasonable expectations of privacy were impacted even though the student athletes had diminished expectations of privacy. *See id.* 26 Cal.Rptr.2d at 860, 866, 865 P.2d at 659, 664. Given the relationship of the facts in this case to the facts in *Hill*, we have no difficulty concluding that Hansen's reasonable expectations of privacy were invaded when she was required to submit to direct observation of urination.

### 4. *Seriousness of the Invasion of Privacy.*

There can be no doubt that direct observation of urination constitutes a very serious invasion of privacy. As the *Hill* court stated, direct observation is "a particularly intrusive" procedure. *Id.* 26 Cal.Rptr.2d at 860, 865 P.2d at 659.

### 5. *Countervailing Government Interests.*

Because Hansen has established all three elements of a privacy claim under the California Constitution as set out by *Hill*, we proceed to examine whether countervailing government interests can justify the direct observation of Hansen's urination. *See Hill*, 26 Cal.Rptr.2d at 857–58, 865 P.2d at 655–56. As discussed in the section dealing with Hansen's federal claims, the state certainly has an important interest in keeping prison guards drug-free in order to prevent lapses in prison security and to lessen the likelihood

of drug-smuggling to inmates. This interest is sufficient to justify drug testing of a prison guard who has admitted using drugs in the past.

### 6. *Less Intrusive Alternatives.*

In the analysis mandated by *Hill* it is not enough simply to determine that the interests on the defendants' side of the equation are important. Rather, even when those interests are compelling, courts are required to proceed to consider whether "there are feasible and effective alternatives" to the means used by the defendants' which would achieve the defendants' ends but "which [would] have a lesser impact on privacy interests." *See id.* 26 Cal.Rptr.2d at 859, 865 P.2d at 657.

It is not completely clear, under *Hill,* whether proof that such alternative means were available *always* would mean that the challenger would prevail. We think it is clear, however, that challengers must prevail if all of the following are established: (1) it is the state (government), rather than a private entity or party, that is invading the challenger's privacy interest, *cf. id.* 26 Cal.Rptr.2d at 857–58, 865 P.2d at 656–57; (2) feasible alternative means to achieving the state's ends are available; (3) if the state used those alternative means, it would achieve its ends as well, or nearly as well, as it does through the challenged procedures; and (4) appreciably less harm would be caused to the challenger's privacy interests if the alternative means were used. As we explain, below, we conclude that plaintiff has shown there can be no genuine dispute as to each of these elements.

Before comparing the evidence on alternative means available in this case to the evidence presented in *Hill,* we note that the *Hill* court rejected an argument that the NCAA had the burden of proving that its drug testing objectives could not be accomplished through less intrusive means. *Id.* 26 Cal.Rptr.2d at 865, 865 P.2d at 663. In rejecting this argument, the court noted that the argument was based on cases involving conduct of government agencies, not conduct of private parties such as the NCAA. *Id.* 26 Cal.Rptr.2d at 865 & n. 16, 865 P.2d at 663 & n. 16. In an earlier portion of its opinion, the

*Hill* court suggested that the balancing of privacy interests, state interests, and alternative means may be less favorable to plaintiffs asserting privacy rights where private action instead of state action is at issue. *See id.* 26 Cal.Rptr.2d at 857–58, 865 P.2d at 656–57.

Thus, a strong argument can be made that the California Constitution requires *state* actors facing privacy right challenges to shoulder the burden of proving that abridgements of privacy utilize the least restrictive feasible and available means. But we need not decide the issue of who bears the burden of proof regarding alternative means here, since we will see that Hansen has submitted uncontradicted evidence that effective means for preventing tampering with drug samples without direct observation were available to CDC when her drug testing took place.

The *Hill* court approved the direct observation component of the NCAA's drug testing program, despite having serious concerns about direct observation, because the plaintiffs in *Hill* did not present any evidence of alternative means for accomplishing the NCAA's drug testing goals without direct observation. *See id.* 26 Cal.Rptr.2d at 866–67, 865 P.2d at 664–65. Before reaching its conclusion, the California Supreme Court declared that "[t]he closest question presented [in *Hill* ] concerns the [direct observation] method used by the NCAA to monitor athletes as they provide urine samples." *Id.* 26 Cal.Rptr.2d at 865, 865 P.2d at 664. The court then noted that the NCAA introduced substantial evidence that drug samples can be altered or substituted, while "plaintiffs did not offer any evidence (whether from experts or other sources) demonstrating that any alternative to direct monitoring with a significantly lesser impact on plaintiff's privacy interests would accomplish the NCAA's objective of ensuring a valid sample." *Id.*

The plaintiff's failure to present evidence of alternative means led the *Hill* court to uphold the direct observation provisions of the NCAA program. *Id.* 26 Cal.Rptr.2d at 867, 865 P.2d at 665. However, the court stated:

Notwithstanding plaintiffs' failure of proof in this case, direct monitoring remains a significant privacy issue in athletic

and nonathletic drug testing cases. Social norms validate the distinction between the mere presence of another person in or around an area where urination takes place (such as a bathroom or locker room) and the direct and purposeful observation of urination act [sic] by someone specially commissioned to witness it. *Id.* The court pointed out that it knew of only two cases which had upheld direct monitoring of urination, and that neither of those cases "consider[ed] the possibility of less intrusive alternatives to direct monitoring." *Id.*

The court then stated:

There may indeed be less intrusive alternatives to direct monitoring that could nonetheless fully satisfy the tester's objective of insuring a valid sample.... Because we are limited to the record before us, we necessarily leave any further consideration of less intrusive alternatives to direct monitoring initially to the judgment and discretion of the NCAA, and then to future litigation, if any.

*Id.* The *Hill* court's treatment of the direct observation issue suggests that the court would have struck down the direct observation component of the NCAA's program if the plaintiffs had presented sufficient evidence of alternatives to direct monitoring which could effectively prevent tampering.

Unlike the plaintiffs in *Hill,* the plaintiff in the case at bar has presented sufficient evidence of alternative means. Hansen has provided us with a declaration from Dr. J. Michael Walsh, a drug testing expert. Among other credentials, Walsh was Executive Director of the President's Drug Advisory Council from 1990 to 1993. Walsh Decl. at 2. Walsh was also a principal author of the National Institute of Drug Abuse (NIDA) Mandatory Guidelines for Federal Workplace Drug Testing Programs, which were developed between 1986 and 1988. *Id.* Walsh declared that consensus opinion "based on collected experience in the field of drug and alcohol abuse" was that "direct viewing of the genitalia of the specimen giver during the collection process provided a very minimal increase in integrity of the specimen." *Id.* at 3.

Walsh further declared that "[t]he procedures called for in the collection process mandated by the [NIDA] guidelines virtually eliminate the possibility of the submission of an adulterated or falsely provided specimen without detection of, or the raising of a strong suspicion that the provider had made such an attempt." *Id.* at 4. The NIDA guidelines protect against sample tampering by preventing the test subject from having access to water when providing a specimen, requiring positive identification of the test subject, requiring the subject to remove outer garments, requiring the subject to wash and dry their hands before providing the specimen, and requiring the subject to remain in the presence of the collection site monitor after washing their hands so that the monitor may prevent the subject from having access to possible contaminants. *Id.* at 5.

With these security measures in place, the test subject is permitted under the NIDA guidelines to produce the sample in the privacy of a stall or other partitioned area. *Id.* at 5. After the sample is produced, security is further enhanced through measurement of the temperature of the sample and through physical inspection of the sample by the collection monitor. *Id.* at 5–6. Walsh also declared that there are a variety of ways to adulterate testing samples even where the collection of the sample is directly observed. *Id.* at 6.

Dr. Walsh's declaration demonstrates that feasible means were available to defendants when Hansen's testing occurred for effectively preventing cheating on drug testing without direct observation of urination. Defendants have presented no evidence contradicting Walsh's declaration.

Because it is not controverted that there were less intrusive means than direct observation for accomplishing defendants' drug testing objectives, and because it is clear that those alternative means would cause substantially less harm to plaintiff's privacy interests (by eliminating the specific invasion that is challenged here, the direct observation), we hold that the direct observation of Hansen's urine tests violated her right to privacy under the California Constitution. We there-

fore grant summary judgment in favor of plaintiff and against defendants Russell and Kim on the liability component of plaintiff's claim that is based on the California constitutional right to privacy. Because we cannot resolve the state law immunity claims of defendants Gomez and Vasquez at this stage, we do not grant summary judgment to either side as to Gomez and Vasquez on the California law privacy claim.

## VI. OTHER ISSUES

Defendants contend that the Eleventh Amendment bars Hansen's damages claims against the CDC and against the individual defendants in their official capacities. Hansen stipulates that those claims should be dismissed. We therefore dismiss Hansen's damages claims against the individual defendants in their official capacities and against the CDC.

Defendants contend that Hansen's claim for injunctive relief is moot because the drug testing agreement that Hansen signed expired by its own terms on January 18, 1995. Hansen refuses to stipulate to dismissal of her claim for injunctive relief, apparently fearing that the CDC may in the future argue that the drug testing agreement was somehow suspended by the litigation over direct observation. We dismiss Hansen's claim for injunctive relief because the drug testing agreement has expired, mooting the injunctive relief claim. We do so on the condition, however, that the CDC acknowledges that the drug testing agreement has legally expired and that the CDC will not use it as a basis for testing Hansen for drugs in the future.

Finally, defendants make numerous procedural objections to evidence submitted by Hansen in support of her motion for summary judgment and her opposition to defendants' motion for summary judgment. We will not discuss defendants' procedural objections in detail. We find that defendants' objections are either meritless or do not affect the evidence that is necessary to decide the issues on which we are ruling.

## VII. SUMMARY AND ORDER

If called upon to do so, we likely would hold that direct observation of urination during drug testing without reasonable, individualized, and articulable suspicion that the person being tested would attempt to tamper with the sample is prohibited under any circumstances by the Fourth Amendment ban on unreasonable searches. However, as it was not clearly established, at the time of the challenged testing, that direct observation under the circumstances presented in this case violated constitutional norms, the individual defendants are immune from Hansen's federal damages claims.

However, at least two of the defendants, Russell and Kim, are not immune from Hansen's damages claim under California law. These two defendants did not exercise discretion when they required direct observation of Hansen's urination, but merely followed a policy that had not been codified as a regulation. Based on the record developed so far, we cannot determine whether defendants Gomez and Vasquez are immune from Hansen's California law privacy claim.

On the merits of Hansen's state constitutional right to privacy claim, we find that there is uncontradicted evidence that procedures which could effectively prevent sample tampering through means appreciably less intrusive than direct observation were available to defendants at the time Hansen's testing took place. We therefore hold that defendants' direct observation procedure violated the right to privacy that is guaranteed to plaintiff by the California Constitution.

For all the reasons set forth above, we hereby ORDER that:

1. Summary judgment be entered in favor of defendants Gomez, Vasquez, Russell, and Kim, in their individual capacities, on Hansen's claim under the Fourth Amendment to the Constitution of the United States, on her purportedly separate federal claim for invasion of her right to bodily privacy, and on her federal claim for failure to train.

2. Summary judgment be entered in favor of plaintiff and against defendants Russell and Kim on the issue of liability (not the

amount of damages) on her privacy claim based on the California constitution.

3. Summary judgment is DENIED on both of the cross-motions that are directed toward plaintiff's California right to privacy claim against defendants Gomez and Vasquez. However, the only issue that remains to be litigated with regard to whether Gomez and Vasquez are liable on this state law claim is whether either or both of these defendants are immune; the issue of whether the direct observation violated the California Constitution may not be relitigated.

4. Hansen's damages claims against the CDC and against Gomez, Vasquez, Russell, and Kim in their official capacities are dismissed by stipulation.

5. Hansen's claim for injunctive relief is dismissed as moot.

IT IS SO ORDERED.