Lillian ALLEN, Plaintiff,

v.

Michael SCHIFF, individually and in his official capacity as Sullivan County Sheriff, and Sullivan County, Defendants.

No. 10 CV 4756 (VB).

United States District Court, S.D. New York.

Dec. 7, 2012.

Memorandum Denying Reconsideration Jan. 14, 2013.

Colleen Margaret Meenan, Meenan and Associates LLC, New York, NY, for Plaintiff.

Samuel S. Yasgur, County of Sullivan, Monticello, NY, for Defendants.

### MEMORANDUM DECISION

BRICCETTI, District Judge:

Plaintiff Lillian Allen brings this Section 1983 civil rights action, alleging violations of the Fourth and Fourteenth Amendments against Sullivan County ("County") and Michael Schiff, the Sullivan County Sheriff, in both his individual and official capacities. Plaintiff also brings claims under New York State Human Rights Law and the Labor Management Relations Act of 1947 ("LMRA").

Defendants move for summary judgment on all claims in the amended complaint. (Doc. # 37.)

For the following reasons, the motion is GRANTED in part and DENIED in part.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a).

### BACKGROUND

The parties have submitted briefs, statements of facts, and declarations with supporting exhibits, which reflect the following factual background.[1]

The Sullivan County Sheriff's Department ("Department"), led by elected Sher-

---

1. Defendants, in their statement of material facts, provide no citations to the record as required by Fed.R.Civ.P. 56(c). *See* Local Civ. R. 56.1 ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be ad-

missible, set forth as required by Fed.R.Civ.P. 56(c)."). Thus, the Court accepts as true the assertions in plaintiff's Rule 56.1 statement that are supported by admissible evidence and otherwise uncontroverted by admissible evidence. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 140 (2d Cir.2003); *Gallimore–Wright v. Long Island R.R. Co.,* 354 F.Supp.2d

iff Michael Schiff, is comprised of three divisions of employees: road patrol deputies, corrections officers, and civilians. Plaintiff, an African–American female, began working as a corrections officer for the Department on October 21, 1996. As a corrections officer, she supervised inmates, maintained order and security within the facility, and transported inmates within the jail and outside it. Her duties involved preventing contraband, such as illicit drugs, from entering the jail, and she was qualified to carry a firearm.

The Civil Service Employees Association Local 853 ("CSEA") represents the Department's corrections officers. The CSEA entered into a collective bargaining agreement with the Department (the "CSEA CBA"), which governed the Department's relationship with those officers from January 1, 2004, to December 31, 2007.

Attachment D to the CSEA CBA, entitled "Substance Abuse Testing Procedure" ("SATP"), directed the Department to implement a drug-testing program whereby corrections officers were required to produce urine to be tested for the presence of illicit drugs. Under the SATP, the Department could conduct up to twelve random tests per year. For each test, the Department was required to select the employees to be tested by using "a scientifically valid method such as a random number table or a computer-based random number generator," so each employee had "an equal chance of being tested each time selections [were] made." No more than twenty percent of the officers could be tested during each of the tests.

The SATP also described procedures, for, among other things, administering each drug test, establishing a specimen's chain-of-custody, and challenging a test's results. Specifically, the SATP provided that "[t]esting personnel of the same sex as the employee shall be present and observe production of the urine sample," and "[w]henever there is a reason to believe that the employee may have altered or substituted the specimen to be provided, a second specimen shall be obtained immediately, under direct observation of the testing personnel." (SATP ¶¶ 3.5.4, 3.5.6.) If an employee's urine tested positive for the presence of drugs, the employee was to be "automatically terminated ... without recourse to Section 75 of the Civil Service Law," which governs removal of civil service employees and limits suspension without pay. (SATP ¶ 3.7.) A terminated employee could file a grievance with an arbitrator, at which point the Department would convert the termination to a suspension without pay. (SATP ¶ 3.7.) The parties confirmed this understanding via Side Letter of Agreement dated June 7, 2006.

The Patrolmen's Benevolent Association ("PBA"), which represents the road patrol deputies, entered into its own collective bargaining agreement with the Department (the "PBA CBA"), which governed the Department's relationship with those deputies. By a 2003 Memorandum of Agreement modifying the PBA CBA, the parties added a provision for "Random and Reasonable Suspicion Drug and Alcohol Testing" following the Department of Transportation's ("DOT") standards. In practice, the Department conducted the testing of road patrol deputies following the procedures described in the SATP.

Sometime between February and April 2007, Sheriff Schiff modified the drug test-

478, 482 (S.D.N.Y.2005) ("[A party's 56.1 statement] must cite admissible evidence in support of the [party's] contention that there is admissible evidence creating a genuine issue for trial.").

ing procedures for both road patrol deputies and corrections officers without consent from their respective unions. Under the new procedures, Schiff directed Partners in Safety ("PS"), a county contractor, to administer a test quarterly during a shift randomly selected by a computer. Schiff directed PS to conduct a test at the Sheriff's Office and, as he stated at his deposition, to observe the collection of urine samples produced by Department employees. As Sara Napier, the PS technician, explained at her deposition, the direction to "observe" a test meant "somebody is in the room observing the urine coming from the body to the cup." Additionally, PS was responsible for establishing the chain-of-custody procedures for the samples.

PS randomly selected the employees working "Shift B" on June 26, 2007, to be drug tested. The Department had no such shift, however. Instead, it assigned officers to work shifts from 12 AM to 8 AM, 8 AM to 4 PM, and 4 PM to 12 AM, which it called Platoons 1, 2, and 3, respectively.

Upon arriving to work the Platoon 2 shift on June 26, 2007, plaintiff was told to go next door to the jail for a drug test (the "Test"). There, plaintiff completed a drug questionnaire. After completing the questionnaire, plaintiff was called to see Napier. Napier wrote plaintiff's name on a zip-top bag and a plastic cup and handed the cup to plaintiff. Napier then followed plaintiff into the bathroom, where she stood in front of plaintiff as plaintiff removed her "uniform pants and undergarments and squatted and balanced herself over the toilet to urinate into the plastic cup." Napier testified at her deposition that she observed urine passing from plaintiff's body into the cup. Afterward, Napier signed a chain-of-custody form for plaintiff's specimen and sealed the cup within the plastic bag. Plaintiff then initialed the bag, which was set aside in a cardboard box while samples were collected from other officers.

Plaintiff's urine tested positive for marijuana. As a result, on July 2, 2007, Schiff terminated her employment. At some point, after speaking with her colleagues, plaintiff learned Donald Buckner, an African–American road patrol deputy, had also failed the test and been terminated. Plaintiff's colleagues informed her that two white corrections officers had allegedly failed the Test but had not subsequently been terminated.

On July 10, 2007, pursuant to paragraph 3.7 of the SATP, the CSEA filed a grievance and demand for arbitration contesting plaintiff's termination. As a result, on August 8, 2007, Schiff converted plaintiff's termination to an indefinite suspension without pay. In a written decision dated February 12, 2009, the arbitrator found plaintiff had tested positive for marijuana, and that issues with the testing procedures did not undermine the results. He also found, however, plaintiff's mitigating circumstances i.e.,—her positive employment record and one-time use of marijuana allegedly to relieve pain from rheumatoid arthritis—called for her reinstatement.

On February 16, 2009, Schiff charged plaintiff, pursuant to Section 75, with using marijuana, testing positive for marijuana, and not reporting her illegal drug use. On May 16, 2010, after reviewing testimony given in the previous arbitration and exhibits submitted by both parties, Hearing Officer Richard A. Martinkovic recommended plaintiff's termination after finding she had possessed and used marijuana, in violation of Department rules, and had committed misconduct as a public servant. Allen was subsequently terminated.

## DISCUSSION

### I. *Standard of Review*

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *Am. Int'l Grp., Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981).

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. If the non-moving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for her. *See Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir.2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. *See Patterson v. County of Oneida,* 375 F.3d 206, 218 (2d Cir. 2004). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,* 391 F.3d 77, 83 (2d Cir.2004).

## II. *1983 Claims Against Schiff*

█ Plaintiff brings three Section 1983 claims against Sheriff Schiff, in his individual and official capacities, based on alleged deprivations of her constitutional rights under the Fourth Amendment, and the Fourteenth Amendment's Equal Protection and Due Process Clauses. To prevail on any of these claims, plaintiff must as a threshold matter show that Schiff, acting under color of state law, violated her constitutional rights. *See Manbeck v. Town of Lewisboro,* 333 Fed.Appx. 599, 601 (2d Cir.2009). Schiff does not argue he or his agents were not acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 49–50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). The question, then, is whether he violated plaintiff's constitutional rights.

### A. *Equal Protection*

Plaintiff's first claim alleges a violation of the Equal Protection Clause of the Fourteenth Amendment, which "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

█ Plaintiff's Equal Protection claim under Section 1983 is evaluated like a Title VII claim for employment discrimination, using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006). Accordingly, plaintiff must establish a prima facie case of discrimination by showing: (1) she is a member of a protected class; (2) she satisfactorily performed her duties; (3) she suffered an adverse employment action; (4) in circumstances giving rise to an inference of discrimination. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995). If plaintiff establishes a prima

facie case, a rebuttable presumption of discrimination arises and the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir.2001). If defendant articulates a non-discriminatory reason, the presumption of discrimination drops out and the burden shifts back to the plaintiff to show that defendant's reason is actually pretext for unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff is not required to prove the prohibited motivation was the sole or even the principal factor in the decision, but must show her protected status contributed to the employer's decision. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir.2001).

The record shows plaintiff is an African-American woman who satisfactorily performed her job and was terminated by the Department. Plaintiff alleges her termination, after failing the Test, was the result of gender and race discrimination. *See* 42 U.S.C. § 2000e–2(a) (listing race and sex as protected classes). To support her claims, plaintiff says she, unlike Caucasian and male employees, was: suspended without pay; terminated; not timely reinstated after the arbitrator's decision; charged under Section 75 based on her mitigating testimony; and, ultimately terminated after a hearing.

■ To support her claim of race discrimination, plaintiff offers declarations from fellow corrections officers Robert Brewster and Charles Mack stating Under Sheriff Eric Chaboty admitted to them that J.W., a white corrections officer, had failed the Test. Plaintiff also states Mack told her that E.S., a white corrections officer, told Mack he had smoked marijuana the day before the Test. Statements by Chaboty and E.S., however, are inadmissi-

ble hearsay the Court cannot consider on summary judgment. Fed.R.Civ.P. 56(c)(4). Thus, plaintiff has not met her prima facie burden to show race discrimination.

■ As to gender discrimination, plaintiff offers evidence showing that, after both she and Buckner failed the Test, the Department terminated her but suspended him. Further, once the Sheriff converted her termination to a suspension, her suspension was unpaid while his was paid. Plaintiff admits Schiff ultimately fired both her and Buckner, after each received a Section 75 hearing, and she provides no evidence of any arbitration, reinstatement, or mitigating testimony related to Buckner. As a result, plaintiff has met her burden regarding the suspension, but has not done so on the other allegations of gender bias.

Schiff rebuts by arguing plaintiff and Buckner were subject to different suspension procedures because she was a corrections officer while he was a road patrol deputy. Specifically, Schiff contends the CSEA CBA waived plaintiff's Section 75 rights, whereas the PBA had never so waived Buckner's rights. As Schiff has provided a legitimate, non-discriminatory reason why he treated plaintiff and Buckner differently, plaintiff is required to show defendant's reason is actually pretext for discrimination.

Plaintiff essentially argues the Sheriff's explanation is pretext because the Department conducted the Test by applying the SATP to both corrections officers and road patrol deputies. Even so, the Department's decision to apply the SATP to PBA employees, without the PBA's agreement, could not have waived PBA employees' Section 75 rights. *See Burka v. N.Y.C. Transit Auth.*, 744 F.Supp. 63, 65 (S.D.N.Y.1990) (citing *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185–86, 92 S.Ct.

775, 31 L.Ed.2d 124 (1972)) (waiver of Section 75 rights must be voluntary, knowing and intelligent). Schiff states the PBA has never waived Section 75 rights for its members, and plaintiff offers no evidence to the contrary.

In sum, Schiff is entitled to summary judgment on plaintiff's Equal Protection claim because plaintiff has failed as a matter of law to show the Department intentionally discriminated against her based on race or gender.

### B. Unreasonable Search and Seizure

■ Plaintiff's second Section 1983 claim alleges Schiff infringed her Fourth Amendment right to be free from an unreasonable government search. The collection by a government employer of urine during the random drug test of a government employee is undoubtedly a search within the Fourth Amendment. *Nat'l Treas. Emps. Union v. Von Raab*, 489 U.S. 656, 663–66, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

■ Three factors determine the constitutionality of such a search: (1) the employee's privacy interest implicated by the search; (2) the intrusiveness of the search; and (3) the government's interest in effecting the search. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654–64, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *United States v. Lifshitz*, 369 F.3d 173, 183–84 (2d Cir.2004). Even in the absence of a warrant, probable cause, or individualized suspicion, the search may be reasonable if the government's interest outweighs the employee's privacy interest it implicates, and the search is conducted reasonably. *Nat'l Treas. Emps. Union v. Von Raab*, 489 U.S. at 665–66, 109 S.Ct. 1384.

### 1. Employee's Privacy Interest

■ The Fourth Amendment protects only those subjective expectations of privacy that society recognizes as "legitimate." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. at 654, 115 S.Ct. 2386. A search considered inappropriate in one context may be reasonable in the context of public employment, especially given the " 'operational realities of the workplace.' " *Nat'l Treas. Emps. Union v. Von Raab*, 489 U.S. at 671, 109 S.Ct. 1384 (quoting *O'Connor v. Ortega*, 480 U.S. 709, 717, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion)). For example, the Supreme Court in *Von Raab* held agents of the U.S. Customs Service tasked with interdicting drugs and carrying firearms had a diminished expectation of privacy with regard to a drug test, because fitness, integrity, dexterity, and judgment were important components of their work. *Id.* at 672, 109 S.Ct. 1384. The Court held an agent's expectation of privacy was diminished further if she was on notice her employer could search her anytime under its random drug-testing program. *Id.* at 672, 109 S.Ct. 1384; *see Wilcher v. City of Wilmington*, 139 F.3d 366, 374 (3d Cir.1998) (expectation of privacy reduced by consenting to random drug testing in collective bargaining agreement).

■ Here, the CSEA agreed to have the Department create a drug-testing program "[t]o ensure the integrity of the Sullivan County Sheriff's Department and to preserve public trust and confidence in a fit and drug free law enforcement profession." (SATP ¶ 1.1.) Plaintiff admits her job as a corrections officer involved interdicting drugs and required her to carry a firearm when transporting inmates. And plaintiff recognizes her employment was subject to the SATP, which mandated random drug testing and provided for obser-

vation of all sample collections.[2] In sum, the Court finds her legitimate expectation of privacy substantially diminished. *See Nat'l Treas. Emps. Union v. Von Raab,* 489 U.S. at 677, 109 S.Ct. 1384; *Nat'l Treas. Emps. Union v. Hallett,* 776 F.Supp. 680, 698 (E.D.N.Y.1991) (applying *Von Raab* to random drug testing of incumbent employees).

### 2. *Character of the Search*

 As the Supreme Court has explained, a search's intrusiveness "depends upon the manner in which production of the urine sample is monitored." *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. at 654, 115 S.Ct. 2386; *see Taylor v. O'Grady,* 888 F.2d 1189, 1195 (7th Cir.1989) ("[T]he manner in which the program is carried out may be so unnecessarily intrusive as to render it constitutionally intolerable."). Although the reasonableness of a search is a matter of law, the character and manner of the search is a matter of fact. *Cf. O'Connor v. Ortega,* 480 U.S. at 726–29, 107 S.Ct. 1492.

The character and manner of the Test are undisputed. Following Department guidance, Sara Napier, the PS technician, observed the Test. According to plaintiff, Napier followed plaintiff into the bathroom and stood "in front of [her] with an unobstructed view" while plaintiff urinated into a plastic cup. Napier corroborated this account, stating at her deposition that she "physically watched [Allen] urinate into a cup."

In *Vernonia School District 47J v. Acton,* the Supreme Court upheld limited, indirect observation of collection of a urine sample, to help assure the sample's genuineness, even where the collector had no prior suspicion of tampering. 515 U.S. at 650, 115 S.Ct. 2386. The Court found the school minimized intrusion on student athletes because a male monitor stood 12 to 15 feet behind a fully clothed male producing a sample at a urinal, and a female monitor stood outside an enclosed bathroom stall where a female was producing a sample. *Id.* at 658, 115 S.Ct. 2386. In both cases, the monitor could "listen for normal sounds of urination" but could not directly observe the subject's excretory function. *Id.* The Court found these conditions nearly identical to everyday occurrences in a public restroom, and held "the privacy interests compromised by the process of obtaining the urine sample are ... negligible." *Id.; see also Nat'l Treas. Emps. Union v. Von Raab,* 489 U.S. at 672 n. 2, 109 S.Ct. 1384 (privacy intrusion limited because "[t]here is no direct observation of the act of urination, as the employee may provide a specimen in the privacy of a stall").

Following *Vernonia,* the Third Circuit upheld drug testing of firefighters using a "direct observation procedure" because, in practice, the privacy intrusion was mitigated. *Wilcher v. City of Wilmington,* 139 F.3d at 375–77. Specifically, the court found the test monitor stood behind male firefighters and to the side of female firefighters, looking "in the firefighters' general direction to ensure that no tampering was taking place during the production of the urine specimen." *Id.* It cautioned, however, that the policy would be more concerning if it "required the monitor to stand in front of the firefighter, or if it demanded the direct observation of the firefighter's genitalia." *Id.* at 376 n. 6.

---

**2.** Defendants argue plaintiff's consent to be tested pursuant to the SATP precludes the Court from finding a constitutional violation. As the SATP makes clear, however, plaintiff only consented to direct observation if there was reason to believe her sample had been tainted. Such suspicion does not appear to have been present here.

More recently, two circuits upheld direct observation when implemented out of concern for a sample's integrity. The District of Columbia Circuit upheld a Department of Transportation ("DOT") regulation requiring direct observation in three situations: (1) if ordered by a medical officer; (2) if the employee had failed or refused a previous test within one year; or (3) if the collector suspected tampering with a specimen. *BNSF Ry. Co. v. United States DOT*, 566 F.3d 200, 202 (D.C.Cir.2009); *see* 49 C.F.R. § 40.67. In so holding, the court noted the DOT had provided "voluminous evidence of the increasing availability of a variety of products designed to defeat drug tests," identified high recidivism rates, and permitted employees to avoid the enhanced procedures by complying with drug regulations. *Id.* at 203–08; *see also Nat'l Treas. Emps. Union v. Yeutter*, 918 F.2d 968, 975–76 (D.C.Cir.1990) (rejecting direct observation unless the government could show the procedure improved testing accuracy). Following *BNSF*, the Sixth Circuit upheld direct observation drug testing of a defendant on pretrial release, despite a lack of individualized suspicion, where the record showed altering a sample was "easy" and "widespread," and direct observation was the only method "fully effective to prevent cheating." *Norris v. Premier Integrity Solutions, Inc.*, 641 F.3d 695, 701 (6th Cir.2011).

Neither the Second Circuit nor district courts within the Circuit have addressed the propriety of direct observation in the drug-testing context. *See Kennedy v. City of N.Y.*, 1995 WL 326563, at *4–5, 1995 U.S. Dist. LEXIS 7437, at *13–14 (S.D.N.Y. May 31, 1995) (declining to reach constitutionality of plaintiff being "ordered to urinate in his hospital room, in front of friends and relatives"); *Storms v. Coughlin*, 600 F.Supp. 1214, 1220 (S.D.N.Y.1984) (treating urinalysis of a prisoner as a body cavity search, without discussing the direct observation method used to collect specimen). Applying *Vernonia's* three-part framework in another context, however, the Second Circuit observed that "the search program at issue must seek a minimum of intrusiveness coupled with maximal effectiveness so that the searches bear a close and substantial relationship to the government's special needs." *See United States v. Lifshitz*, 369 F.3d at 186 (reviewing Fourth Amendment precedent on drug testing to analyze analogous computer monitoring). This comports with prior decisions emphasizing the importance of finding at least a modicum of suspicion before commencing an invasive search. *See, e.g., Sec. & Law Enforcement Emps. v. Carey*, 737 F.2d 187, 203–05 (2d Cir.1984) (requiring reasonable suspicion to conduct strip or body cavity search of prison guard); *Corr. Officers Benevolent Ass'n v. Kralik*, 2011 WL 1236135, at *11, 2011 U.S. Dist. LEXIS 35361, at *35–36 (S.D.N.Y. Mar. 30, 2011) (finding Second Circuit cases protect prisoners from being "regular[ly] and close[ly]" viewed nude); *Nat'l Treas. Emps. Union v. Hallett*, 776 F.Supp. at 695 (upholding drug test because it used "intrusion-minimizing procedures").

▮▮▮ This Court finds direct observation of the collection of a urine sample may be appropriate if the government articulates a concern about the test's efficacy that justifies the additional encroachment upon privacy. In other words, absent consent, direct observation may be permitted if (1) ordered by a medical officer involved in the testing; (2) the employee has failed or refused a previous test; or (3) a test administrator has reason to suspect the specimen's integrity has been compromised. *See BNSF Ry. Co. v. United States DOT*, 566 F.3d at 202; *see also Hansen v. Cal. Dep't of Corrs.*, 920 F.Supp. 1480, 1492–93 (N.D.Cal.1996) (col-

lecting cases from the Second, Third, Sixth, Eighth, Ninth, and District of Columbia Circuits disfavoring direct observation and its analogs in various contexts). None of those circumstances is present here. As a result, whether the search at issue is reasonable depends on the government's interest in directly observing the employee producing the specimen.

### 3. Government's Interest

■ It is well established that the government has a compelling interest in ensuring the integrity of its law enforcement officers who interdict drugs and carry firearms. *Nat'l Treas. Emps. Union v. Von Raab*, 489 U.S. at 670–71, 109 S.Ct. 1384. The critical question, however, is whether that interest "appears important enough to justify the particular search at hand, in light of other factors that show the search" was highly intrusive upon a diminished expectation of privacy. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. at 661, 115 S.Ct. 2386.

Sheriff Schiff does not specifically articulate his interest in conducting the Test. He notes plaintiff is a corrections officer tasked with interdicting drugs and carrying a firearm. He also points to the SATP, which directs him to implement a drug-testing program "[t]o ensure the integrity of the Sullivan County Sheriff's Department and to preserve public trust and confidence in a fit and drug free law enforcement profession." Finally, the Sheriff references a "zero tolerance policy" regarding illicit drug use by his staff, without elaborating on the Department's interest in such a policy, and cites efficiencies gained by revising the drug-testing procedures that existed before the Test.

■ The Sheriff neither articulates an interest relating to the efficacy of the testing procedures, nor provides a basis for suspecting plaintiff's sample was corrupted. The government "need not wait for a cheating problem to develop in order to justify its use of direct observation," *Wilcher v. City of Wilmington*, 139 F.3d at 378, but it must nevertheless provide some justification for its highly intrusive search. *See, e.g., Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. at 661, 115 S.Ct. 2386; *BNSF Ry. Co. v. United States DOT*, 566 F.3d at 203–08; *Norris v. Premier Integrity Solutions, Inc.*, 641 F.3d at 700; *Byrne v. Mass. Bay Transp. Auth.*, 196 F.Supp.2d 77, 83 (D.Mass.2002) (upholding direct observation because "no officer may be required to submit to direct observation unless a reason for that additional precaution exists and is articulated"). Schiff has not done so here.

Without a full picture of the government's interest, the Court cannot properly weigh and balance the three *Vernonia* factors. As a result, the Court finds a genuine issue of material fact on plaintiff's second cause of action.[3]

### C. Due Process

■ Plaintiff's third claim alleges Schiff violated her right to substantive due process by bringing disciplinary charges stemming from an unconstitutional search. Plaintiff's substantive due process claim thus appears predicated on her Fourth Amendment claim, and it is properly evaluated under that standard. *See Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality) ("Where a particular Amendment provides an explicit textual source of constitutional pro-

---

**3.** Plaintiff's additional complaints regarding the Test's administration do not evince constitutional error. *See, e.g., Warren v. Luzerne County*, 2010 WL 521130, at *4–5, 2010 U.S. Dist. LEXIS 11209, at *13–16 (M.D.Pa. Feb. 9, 2010); *Griffin v. Long Island R.R.*, 1998 U.S. Dist. LEXIS 19336, at *22–23 (E.D.N.Y. June 5, 1998).

tection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (internal quotation marks admitted)). In any event, plaintiff's termination for admitting to ingesting marijuana, in open contravention of known Department policy, can hardly be considered "arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Therefore, plaintiff's Due Process claim is dismissed.

### III. *Qualified Immunity of Schiff*

Although the Court has found a genuine issue of fact as to the reasonableness of the search, it must still determine whether Sheriff Schiff is entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Court holds he is so entitled.

■■■■ Qualified immunity is immunity from suit rather than a defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The doctrine insulates government officials from liability in suits against them in their individual capacity when their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see Hafer v. Melo*, 502 U.S. 21, 25–26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). For a right to be "clearly established," it must be clear enough that the official could have reasonably believed that his actions were unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[I]n light of pre-existing law the unlawfulness must be apparent."). The standard " 'gives ample room for mistaken

judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

■■■■ As discussed above, at the time of the Test its illegality was *not* clearly established. The Supreme Court had explained that the government, consistent with the Fourth Amendment, may randomly test its employees for drug use when its interest in testing outweighs the employees' interest in privacy, and when it reasonably conducts the search. What is more, the Court is aware of no case, either as of June 26, 2007, or as of today, holding direct observation of a drug test by someone of the same sex *per se* unconstitutional. Thus, the Court finds Schiff would not have understood his actions violated a "clearly established" constitutional right of which a reasonable person would have known. *See, e.g., Baker v. Welch*, 2003 WL 22901051, at *11–20, 2003 U.S. Dist. LEXIS 22059, at *36–74 (S.D.N.Y. Dec. 10, 2003) (Rep. & Rec.) (finding law not clearly established regarding opposite-sex direct observation of parolee drug test); *Lumsden v. Ramsey County Cmty. Corrs. Dep't*, 2003 WL 221806, at *7–8, 2003 U.S. Dist. LEXIS 1813, at *27–28 (D.Minn. Jan. 28, 2003) (applying qualified immunity to suit arising from same-sex direct observation of parolee urine testing); *Hansen v. California Dept. of Corrs.*, 920 F.Supp. 1480, 1489 (N.D.Cal.1996) (same).

Accordingly, Schiff is entitled to qualified immunity for all claims against him in his individual capacity.

### IV. *Monell Liability*

#### A. *Sullivan County*

Plaintiff's fourth claim alleges the County's policies, practices, and customs violat-

ed her constitutional rights under the Fourth and Fourteenth Amendments. Although there is no *Monell* liability based on a Fourteenth Amendment violation, because one did not occur, the County may be liable on plaintiff's Fourth Amendment unreasonable search and seizure claim.

■ The Court analyzes claims against the County following the well-worn path of *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under *Monell*, a municipality may be liable for deprivation of an employee's constitutional rights "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694, 98 S.Ct. 2018. Plaintiff may allege a municipal 'policy' based on a single decision by a municipal policymaker, so long as that policymaker possessed final authority to establish municipal policy in the area at issue. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion). "[F]or example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability." *Id.* at 484 n. 12, 106 S.Ct. 1292.

Plaintiff neither contends the SATP was official County policy sanctioning unconstitutional conduct, nor alleges the County had a custom of conducting unconstitutional searches. Plaintiff instead alleges the County approved the policy, but she only cites evidence showing the County knew about the new method of selecting employees for testing by shift. Nowhere does she show the County knew the Test would be directly observed. Therefore, to avoid

summary judgment, plaintiff must show Schiff was the final policymaker with respect to the Test and he established official County policy.

■ "Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes v. Barnes*, 208 F.3d 49, 52–58 (2d Cir.2000); *see, e.g., McMillian v. Monroe County*, 520 U.S. 781, 786, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (whether an official possesses final policymaking authority is a legal question determined by state law). Under New York law, the sheriff of Sullivan County is an elected official. *See* N.Y. Const. art. XIII, § 13(a); N.Y. County Law § 400 ¶ 1; Sullivan County Charter § C7.00. The sheriff has "custody of the county jails," N.Y. Correct. Law § 500–c, and is responsible for their care and maintenance. *Jeffes v. Barnes*, 208 F.3d at 58; Sullivan County Charter § C7.01. The sheriff may appoint staff who serve at his pleasure, N.Y. County Law § 652 ¶ 2, but sheriffs' employees are included in the State civil service system. Sullivan County Charter § 70–30. Neither New York County Law nor the County charter specifically discuss whether the Sheriff has the power to set employee drug-testing policy.

■ In context, the evidence shows Schiff had final policymaking authority regarding the Test. The County was a party to the CSEA CBA, but the SATP charges the Department—without reference to the County—with implementing a drug-testing program, maintaining chain-of-custody documentation, and providing laboratory reports to employees. In fact, the only mention of non-Sheriff's Department employees in the SATP relates to the confidentiality of employee records, not testing procedures. Plaintiff augments

the text of the SATP with deposition testimony showing Schiff spearheaded the change to selection procedures and directed PS, the Department's contractor, to "observe" the Test. It follows, then, that Schiff had final policymaking authority on drug testing Department employees, and his decision to have PS observe the Test established County policy. Therefore, the County may be liable, under *Monell,* for that policy.

Plaintiff's fifth claim seeks to hold the County liable for Schiff's actions, based on a *respondeat superior* theory. That claim is dismissed, because *"[r]espondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

### B. *Schiff in his Official Capacity*

■ The Court also evaluates claims against Schiff in his official capacity under *Monell. McMillian v. Monroe County,* 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) ("A suit against a governmental officer 'in his official capacity' is the same as a suit 'against [the] entity of which [the] officer is an agent.'" (quoting *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). A government official may be liable in his official capacity if plaintiff can show he violated her constitutional rights by establishing a custom or policy fostering the violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *see Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012) (stating in dicta that the third Colon factor, cited above, appears to remain viable after *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

As discussed above, plaintiff has shown Schiff established municipal policy to directly observe the production of urine samples during the Test. Consequently, summary judgment is denied on plaintiff's Section 1983 claim against Schiff in his official capacity for violating her Fourth Amendment rights.

### V. *NYSHRL Claims*

■ Plaintiff's sixth claim is for race and gender discrimination under the NYSHRL. The framework for analyzing a NYSHRL claim is the same as under Section 1983, which looks to Title VII for the controlling standard. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 (2d Cir. 2000). For the reasons stated above, defendants are entitled to summary judgment on this claim.

■ Plaintiff's seventh claim is for discrimination based on disability under the NYSHRL. Discrimination based on disability is analyzed under the Americans with Disabilities Act, using the *McDonnell Douglas* burden-shifting framework set forth above. *Spiegel v. Schulmann,* 604 F.3d 72, 80–81 (2d Cir.2010).

■ Assuming plaintiff has met her prima facie burden, defendants have demonstrated a legitimate, non-discriminatory reason for terminating her; namely, plaintiff's admission that she ingested marijuana, in contravention of the Department's zero-tolerance policy on drug use. Plaintiff fails to prove the non-discriminatory explanation proffered by defendants is pretext for unlawful discrimination. Accordingly, defendants are entitled to summary judgment on plaintiff's seventh claim.

### VI. *Labor Management Relations Act of 1947*

■ Plaintiff's remaining claims allege breach of contract under section 301 of the Labor–Management Relations Act of 1947, 29 U.S.C. § 185: Her eighth claim alleges defendants breached the CBA, Side Letter

of Agreement, and SATP in administering the Test, and her ninth claim alleges defendants breached those agreements by subsequently terminating her under section 75 of the New York Civil Service Law.

Plaintiff offers evidence showing defendants failed to administer the Test in accordance with the agreed upon procedures, including those governing employee selection and chain-of-custody. Defendants contend the Test was sufficiently random, but do not address whether the Test complied with the SATP. Neither party addresses whether plaintiff's termination complied with the CBA, Side Letter of Agreement, and SATP.

Therefore, the Court finds genuine issues of material fact on plaintiff's eighth and ninth claims.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED as to all claims asserted against defendant Michael Schiff in his individual capacity.

Defendants' motion for summary judgment is GRANTED as to plaintiff's first, third, sixth, and seventh causes of action asserted against defendant Michael Schiff in his official capacity, and DENIED as to plaintiff's second, eighth, and ninth causes of action against Schiff in his official capacity.

Defendants' motion for summary judgment is GRANTED as to plaintiff's fourth cause of action as it relates to the Fourteenth Amendment, as well as to her fifth, sixth, and seventh causes of action asserted against defendant Sullivan County, and DENIED as to plaintiff's fourth cause of action as it relates to the Fourth Amendment, as well as to plaintiff's eighth and ninth causes of action against Sullivan County.

The Clerk is instructed to terminate the motion (Doc. # 37).

The parties are directed to submit a Joint Pretrial Order in accordance with the Court's Individual Practices by January 11, 2013.

All counsel are directed to appear for a pretrial conference on January 18, 2013 at 12:00 noon.

SO ORDERED.

## MEMORANDUM DECISION

On December 7, 2012, this Court granted in part and denied in part defendants' motion for summary judgment. *See Allen v. Schiff*, 908 F.Supp.2d 451, 2012 WL 6097702 (S.D.N.Y. Dec. 7, 2012). On December 21, 2012, plaintiff moved for reconsideration of the Court's December 7 decision (Doc. # 60), insofar as the Court found a genuine issue of fact regarding defendants' interest in effecting the search, and did not grant summary judgment for plaintiff on her Fourth Amendment claim.

The Court presumes familiarity with the facts and procedural history of this case.

To prevail on a motion for reconsideration, "the movant must demonstrate 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Catskill Dev., L.L.C v. Park Place Entm't Corp.*, 154 F.Supp.2d 696, 701 (S.D.N.Y.2001) (quoting *Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir.1983)). Such a motion should be granted only where the Court has overlooked facts or precedent which might have "materially influenced" the earlier decision. *Park S. Tenants Corp. v. 200 Cent. Park S. Assocs. L.P.*, 754 F.Supp. 352, 354 (S.D.N.Y.1991); S.D.N.Y. Local Civil Rule 6.3 (providing that a motion for reconsideration or reargument must identify "con-

cisely the matters or controlling decisions which counsel believes the Court has overlooked"). The movant's burden is made weighty to avoid "wasteful repetition of arguments already briefed, considered and decided." *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y.1989).

The motion must be "narrowly construed and strictly applied in order to discourage litigants from making repetitive arguments on issues that have been thoroughly considered by the court." *Range Rd. Music, Inc. v. Music Sales Corp.,* 90 F.Supp.2d 390, 391–92 (S.D.N.Y.2000) (citation omitted). Further, the motion may not "advance new facts, issues or arguments not previously presented to the Court." *Morse/Diesel, Inc. v. Fid. & Deposit Co. of Md.,* 768 F.Supp. 115, 116 (S.D.N.Y.1991). This limitation ensures finality and "prevent[s] the practice of a losing party examining a decision and then plugging the gaps of the lost motion with additional matters." *Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988).

Plaintiff does not cite new evidence in support of her motion for reconsideration. Instead, she argues injustice will result from "referring the determination of the governmental interest factor to a jury," and cites three cases—*United States v. Amerson,* 483 F.3d 73 (2nd Cir.2007); *Nicholas v. Goord,* 430 F.3d 652 (2nd Cir. 2005); and *Palladino v. City of N.Y.,* 870 F Supp.2d 350 (S.D.N.Y.2012)—discussing the application of the special-needs test in the Second Circuit.

First, the Court could not have overlooked these cases because plaintiff did not cite them in her opposition to summary judgment. In any event, the cases neither conflict with the Court's holding that there is a genuine issue of fact as to the government's interest, nor indicate the Court misapplied the proper test as articulated

by the Supreme Court in *Vernonia School District 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

Although the Court *may* enter summary judgment in favor of plaintiff, see Fed. R.Civ.P. 56(f) (emphasis added), the Court did not err in declining to do so where plaintiff did not cross-move for summary judgment. *See, e.g., Osuna v. Gov't Emps. Ins. Co.,* 2012 WL 2888326, at *6 n. 5, 2012 U.S. Dist. LEXIS 98622, at *18 n. 5 (E.D.N.Y. July 16, 2012).

Accordingly, the Court DENIES the motion for reconsideration.

The Clerk is instructed to terminate the motion. (Doc. # 60).

SO ORDERED.